*Attorney Grievance Commission of Maryland v. Marylin Pierre*, AG No. 42, September Term, 2021.

**ATTORNEY DISCIPLINE — SANCTION — REPRIMAND**

The Court issued a reprimand to an attorney who (1) made a knowing and intentional misrepresentation that impugned the integrity of sitting judges during an election campaign and (2) made a knowing and intentional misrepresentation by omission of information on an out-of-state bar application. The attorney's conduct violated Maryland Attorneys' Rules of Professional Conduct 8.2(a) (Judicial and Legal Officials) and 8.4(a), (c), and (d) (Misconduct), as well as New York Disciplinary Rules 1-101 (Maintaining Integrity and Competence of the Legal Profession), and 1-102 (Misconduct).

Circuit Court for Anne Arundel County
Case No. C-02-CV-21-001655
Argued: February 2, 2023

IN THE SUPREME COURT OF

MARYLAND*

AG No. 42

September Term, 2021

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

MARYLIN PIERRE

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Eaves,
Battaglia, Lynne, A. (Senior
    Justice, Specially Assigned),

JJ.

_____

Opinion by Fader, C.J.
Battaglia, J., concurs.
Watts, J., concurs and dissents.

_____

Filed: August 16, 2023

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

This Attorney Grievance Commission of Maryland proceeding concerns the alleged professional misconduct of Marylin Pierre, the respondent and a member of the Bar of this State. It also concerns an overlay of factors that significantly complicates our review of Ms. Pierre's alleged violations of the Maryland Attorneys' Rules of Professional Conduct ("MARPC"). That overlay arises from the circumstances in which the investigation of Ms. Pierre began and the absence of provisions in our rules to guide investigations arising in such circumstances.

The core allegations against Ms. Pierre arose from accusations made in an August 2020 campaign email. The email was sent by the campaign manager for a slate of four sitting judges against whom Ms. Pierre was running for a seat on the Circuit Court for Montgomery County. Sent just over two months before election day, the email was directed to Montgomery County attorneys and identified an "Urgent Need for Action." The email alleged, among other things, that Ms. Pierre's campaign had made false statements about the sitting judges, that Ms. Pierre had misstated her professional qualifications, and that she had engaged in unprofessional conduct in connection with a lawsuit more than two decades earlier.

Among the recipients of the campaign email was then-Bar Counsel. In the absence of any rules or procedures governing the investigation of allegations of misconduct arising in the midst of a judicial election, Bar Counsel immediately opened an investigation, informed the sitting judges' campaign manager of the existence of the investigation, and sought additional information. Soon thereafter, less than two months before the election, Bar Counsel sent Ms. Pierre a letter summarizing many of the allegations leveled by her

rivals' campaign and insisted that Ms. Pierre respond to them in writing, in many cases by explaining and justifying statements made by her or her campaign, within two weeks.

The judicial electoral context in which the MARPC violations at the heart of this matter arose, combined with the timing of the investigation, presents two challenges for our review of those violations. First, any case in which alleged violations arise from speech that is related to an election or that is critical of judges presents First Amendment concerns. This case involves both. Second, the initiation of an investigation into an attorney challenging a slate of sitting judges at a sensitive point in the campaign gives rise to a risk that the investigation will be perceived as an attempt to interfere in the election to favor the sitting judges. In that circumstance, absent a need to proceed expeditiously, the good faith of Bar Counsel—which is something we do not question here—may be insufficient to avoid undermining public confidence in the integrity of the attorney disciplinary process. Both of those challenges play prominently in our review of the charges against Ms. Pierre and our consideration of the appropriate sanction.

After completing its investigation, the Commission, acting through Bar Counsel, filed a petition for disciplinary or remedial action in which it alleged that Ms. Pierre violated the MARPC and the New York Code of Professional Responsibility Disciplinary Rules ("NYDR") as a result of her: (1) misleading or false statements about the sitting judges in her 2020 campaign materials; (2) willful misrepresentations about her background on her 1999 Application for Admission to the Bar of New York ("New York Bar Application"); (3) willful misrepresentations about her background and career experience on her applications for various judgeships in Montgomery County between

2

2012 and 2017; and (4) false statements under oath and failure to timely respond to Bar Counsel's investigatory demands. The Commission asserted that Ms. Pierre's conduct violated MARPC 8.1 (Bar Admission and Disciplinary Matters) (Rule 19-308.1), MARPC 8.2 (Judicial and Legal Officials) (Rule 19-308.2), MARPC 8.4 (Misconduct) (Rule 19-308.4),[1] NYDR 1-101 (Maintaining Integrity and Competence of the Legal Profession), and NYDR 1-102 (Misconduct).[2]

The assigned hearing judge found by clear and convincing evidence that Ms. Pierre had violated each MARPC and NYDR alleged, although the hearing judge rejected several of the grounds on which Bar Counsel had relied for those violations. The hearing judge also determined the existence of seven aggravating and four mitigating factors.

Bar Counsel filed no exceptions. Ms. Pierre filed exceptions that, in effect, challenge all of the hearing judge's findings of fact and conclusions of law that were adverse to her. We sustain many of Ms. Pierre's exceptions to the hearing judge's findings of fact but overrule those exceptions concerning two false statements she made about the sitting judges and a misrepresentation on her New York Bar Application. We sustain Ms. Pierre's exceptions to the hearing judge's conclusions of law that she violated MARPC

---

[1] Effective July 1, 2016, the Maryland Lawyers' Rules of Professional Conduct, which employed the numbering format of the American Bar Association Model Rules, were renamed the MARPC and recodified without substantive modification in Title 19, Chapter 300 of the Maryland Rules. For ease of reference and comparison with our prior opinions and those of other courts, we will refer to the MARPC rules using the numbering of the model rules, as permitted by Rule 19-300.1(22) and as identified in the paragraph to which this footnote is appended.

[2] The Commission charged Ms. Pierre under the NYDR that were in place in 1999, which was the year Ms. Pierre engaged in the conduct alleged to have violated those rules.

3

8.1(a) and (b) and 8.4(b). We overrule her exceptions to the hearing judge's conclusions of law that she violated MARPC 8.2(a), MARPC 8.4(a), (c), and (d), and NYDR 1-101 and 1-102.

Bar Counsel recommended the sanction of disbarment, while Ms. Pierre recommended imposing no sanction. Given the overlay of circumstances mentioned above, and without intending to diminish the seriousness of the misconduct in which Ms. Pierre engaged, we will issue a reprimand.

## BACKGROUND

### A. Context

The 2020 election for four seats on the Circuit Court for Montgomery County is the context underlying both the initiation of the investigation that resulted in this proceeding and several of the alleged violations. We therefore begin by discussing four considerations arising from that context that are important to our analysis.

First, any investigation into a candidate for elected office that is undertaken at a sensitive point in the electoral process presents risks that should be avoided or minimized to the extent possible.[3] Few things in our form of government rise to the level of importance of the State's interest in promoting faith in the integrity of the electoral process by which citizens choose their elected officials. Any perception that a government actor has attempted to exert undue influence on the outcome of an election risks undermining

---

[3] Our comments and analysis throughout this opinion are confined to the activities of the Commission and Bar Counsel, and specifically are not intended to encompass the activities of entities whose responsibilities include oversight of the electoral process.

that faith. Government investigations of candidates for office during the heat of a campaign—especially, but not only, if they become a matter of public knowledge before the election—risk either: (1) an appearance of an attempt to exert influence on the election; or (2) actually affecting the outcome, whether intended or not.[4]

To avoid the potentially corrosive or otherwise unintended effects that could accompany the pursuit of an investigation during the heat of an election, future investigations by Bar Counsel into alleged misconduct by a candidate in a judicial election should generally be postponed until after the election unless: (1) doing so would put an individual or the public at risk from past or potential future misconduct that is within the purview of the Commission and that could be avoided by prompt investigation; or (2) prompt investigation is necessary to preserve evidence. In either case, Bar Counsel should generally confine pre-election activities to what is necessary to satisfy the exigency. Although our own rules do not yet contain such guidance,[5] other investigative agencies

---

[4] *See, e.g.*, Dennis Halcoussis, Anton D. Lowenberg & G. Michael Phillips, *An Empirical Test of the Comey Effect on the 2016 Presidential Election*, 101 Soc. Sci. Q. 161, 168-69 (2020) (concluding that "[a]nnouncements by the FBI regarding investigations of Clinton's emails . . . did appear to have an effect" on the candidates' electoral chances); Nathaniel Rakich, *How Trump's Indictment Could Affect the 2024 Election*, FiveThirtyEight (Mar. 31, 2023), https://fivethirtyeight.com/features/trump-indictment-2024-election/ (last accessed July 26, 2023), *archived at* https://perma.cc/QY37-5NDE.

[5] Following the issuance of this opinion, we will refer to the Standing Committee on the Rules of Practice and Procedure consideration of adopting a rule establishing procedures for addressing alleged misconduct violations that arise during the pendency of election campaigns generally and campaigns for judicial offices specifically.

have recognized in rule or practice that such investigations should be delayed, postponed, or at least not disclosed during the run-up to an election.[6]

The sensitivity of the timing of such investigations is recognized in memoranda distributed to employees of the United States Department of Justice. In a 2022 memorandum, Attorney General Merrick Garland stated that all Department employees "must be particularly sensitive to safeguarding the Department's reputation for fairness, neutrality, and nonpartisanship."[7] For that reason, the Attorney General directed that any

---

[6] For example, Michigan Rules governing judicial disciplinary procedures state that "[i]f a request for investigation is filed less than 90 days before an election in which the respondent is a candidate" and is not frivolous, the investigating commission "shall postpone its investigation until after the election" unless two-thirds of the commission members determine "the public interest and the interests of justice require otherwise." Mich. Ct. R. 9.220(C). On the federal level, the United States Department of Justice has an unwritten but widely acknowledged general practice of delaying public disclosure of investigative steps related to electoral matters or a candidate for office within 60 days of a primary or general election. *See* U.S. Dep't of Just., Off. of the Inspector Gen., *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election* 16-18 (2018) ("[T]here is a general admonition that politics should play no role in investigative decisions, and that taking investigative steps to impact an election is inconsistent with the Department's mission and violates the principles of federal prosecution."); *Federal Prosecution of Election Offenses* 8-9 (Richard C. Pilger ed., 8th ed. 2017) (discussing Department of Justice procedure when investigating an individual in relation to election fraud, noting that "any criminal investigation by the Department must be conducted in a way that minimizes the likelihood that the investigation itself may become a factor in the election. . . . Accordingly, it is the general policy of the Department not to conduct overt investigations . . . until after the outcome of the election allegedly affected by the fraud is certified.").

[7] *Election Year Sensitivities Memorandum from the Attorney General to All Department of Justice Employees* (May 25, 2022), available at https://www.documentcloud.org/documents/22089098-attorney-general-memorandum-election-year-sensitivities, *archived at* https://perma.cc/P9VR-QD98. The 2022 memorandum is substantially similar in relevant part to a 2012 memorandum from Attorney General Eric Holder. *See, e.g.*, *Election Year Sensitivities Memorandum from the Attorney General to All Department of Justice Employees* (Mar. 9, 2012), available at

employee facing "an issue, or the appearance of an issue, regarding the timing of statements, investigative steps, charges, or other actions near the time of a primary or general election [should] contact the Public Integrity Section of the Criminal Division . . . for further guidance."[8]  In February 2020, then-Attorney General William Barr similarly warned of the need to "be sensitive to safeguarding the Department's reputation for fairness, neutrality, and nonpartisanship," and imposed special requirements for the opening of any investigation into a candidate for federal office.[9]  His memorandum announcing the requirements recognized that

> [i]n certain cases, the existence of a federal criminal or counter-intelligence investigation, if it becomes known to the public, may have unintended effects on our elections.  For this reason, the Department has long recognized that it must exercise particular care regarding sensitive investigations and prosecutions that relate to political candidates, campaigns, and other politically sensitive individuals and organizations—especially in an election year.[10]

Second, election-related speech is at the very heart of the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights.[11]  This

---

https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/ag-memo-election-year-sensitivities.pdf, *archived at* https://perma.cc/7PP2-TN8X.

[8] *Id.*

[9] *Additional Requirements for the Opening of Certain Sensitive Investigations* (Feb. 5, 2020), available at https://docs.house.gov/meetings/JU/JU00/20200624/110836/HHRG-116-JU00-20200624-SD009-U19.pdf, *archived at* https://perma.cc/553S-B85D.

[10] *Id.*

[11] The First Amendment to the United States Constitution provides in relevant part: "Congress shall make no law . . . abridging the freedom of speech[.]"  Article 40 of the Maryland Declaration of Rights provides in relevant part:  "[T]hat every citizen of the State ought to be allowed to speak, write and publish [that citizen's] sentiments on all subjects, being responsible for the abuse of that privilege."

7

Court has acknowledged that "'speech about the qualifications of candidates for public office,' including judicial candidates, is 'at the core of our First Amendment freedoms.'" *Attorney Grievance Comm'n v. Stanalonis*, 445 Md. 129, 140 (2015) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002)). Such political speech is entitled to "the highest level of First Amendment protection." *Stanalonis*, 445 Md. at 141; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346-47 (1995) ("Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression[.]" (quoting *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976)).

Third, speech that is critical of judges is also subject to robust free speech protection. *See Attorney Grievance Comm'n v. Frost*, 437 Md. 245, 265-68 (2014). As a result, for such speech to be actionable as a violation of the MARPC, it must meet the high standard set forth by the United States Supreme Court in *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964), which is to say that it must be false and must have been made either knowing it to be false or with reckless disregard for its truth or falsity. *Frost*, 437 Md. at 263.

Fourth, given Bar Counsel's close association with the Judiciary, special considerations apply to investigations by Bar Counsel into the conduct of a candidate in a judicial election during the pendency of the election. This Court is ultimately responsible for the regulation of the practice of law in the State. *Attorney Grievance Comm'n v. Clevenger*, 459 Md. 481, 492 (2018) ("Our power to issue rules concerning practice and

8

procedure in Maryland courts derives from the Maryland Constitution, and the General Assembly has recognized our broad authority to regulate the practice of law[.]" (citations omitted)). In furtherance of that responsibility, we, by Rule, have established the Attorney Grievance Commission and the position of Bar Counsel. The Commission, established by Rule 19-702, is comprised of 12 members, including nine attorneys and three non-attorneys, all appointed by this Court for three-year terms and subject to removal by this Court at any time. Md. Rule 19-702(a), (b), (f). Among other duties, the Commission appoints Bar Counsel, subject to approval from this Court; supervises Bar Counsel's activities; authorizes Bar Counsel's employment of attorneys, investigators, and other staff; approves or rejects Bar Counsel's recommendations concerning actions to take after investigating complaints, including dismissal, reprimand, or the filing of a petition for disciplinary or remedial action; and prepares an annual budget for the disciplinary fund subject to this Court's approval. Md. Rule 19-702(h).

The position of Bar Counsel is established by Rule 19-703. Bar Counsel is appointed by the Commission, subject to this Court's approval, and serves at the pleasure of the Commission. Md. Rule 19-703(a). Among other duties, Bar Counsel is charged with investigating professional misconduct or incapacity by attorneys in the State; filing statements of charges and prosecuting all disciplinary and remedial proceedings; filing petitions for disciplinary and remedial actions in the Commission's name; monitoring and enforcing compliance with this Court's disciplinary and remedial orders; and initiating, intervening in, and prosecuting actions to enjoin the unauthorized practice of law. Md. Rule 19-703(b).

9

The roles and activities of the Commission and Bar Counsel with respect to all aspects of attorney discipline investigations, proceedings, and dispositions are further established by Rules promulgated by this Court. *See* Md. Rules 19-701–19-752. Although the Commission and Bar Counsel, by design, function independently of this Court, they play a critical role in carrying out our responsibility to regulate the legal profession in Maryland by, as set forth in the Commission's mission statement, "protecting the public and maintaining the integrity of the legal profession."[12] The Commission's and Bar Counsel's close connection to the Judiciary advise caution in taking actions against a candidate who is challenging sitting judges to avoid the possibility that members of the public may perceive such actions as motivated by a desire to support the sitting judges.[13]

With that context, we turn to the facts of the matter before us.

### B.     *Procedural History*

In the November 2020 general election, five candidates were vying for four seats on the Circuit Court for Montgomery County. Four of the candidates, Judges Bibi Berry, David Boynton, Christopher Fogleman, and Michael McAuliffe, were sitting judges who had been appointed by Governor Lawrence J. Hogan, Jr. following their formal vetting and nomination by the Montgomery County Judicial Nominating Commission. Exec. Order.

---

[12] *See* Attorney Grievance Commission of Maryland, Administrative and Procedural Guidelines, Updated Nov. 23, 2021, available at: https://www.courts.state.md.us/sites/default/files/import/attygrievance/docs/administrativ eprocedures.pdf, *archived at* https://perma.cc/6UXZ-EWEE.

[13] In discussing the need to avoid the possibility that members of the public may perceive an investigation or charges pursued by Bar Counsel as improperly motivated, we do not mean to suggest that the actions of Bar Counsel in this case were improperly motivated.

No. 01.01.2019.05. The four sitting judges were running together as a unified slate, with a campaign chaired by J. Stephen McAuliffe III. One of the challengers was Ms. Pierre, who had been unsuccessful in several attempts at making it through the nominating commission and was attempting to win a seat by direct election, as permitted by the Maryland Constitution. Md. Const. art. IV, §§ 3, 5.

On August 28, 2020, just over two months before the November 3 election, Mr. McAuliffe sent a campaign email to attorneys in Montgomery County with the subject line, "Lawyers and the Urgent Need for Action." The email had a picture of the four sitting judges, referenced an earlier email promoting the qualifications of the sitting judges and the rigorous process by which they were selected, and provided "some facts about the challenger, Ms. Marylin Pierre." Mr. McAuliffe provided some factual information to refute claims that Ms. Pierre had made about bias in the judicial selection process and diversity on the bench, and then made a series of allegations against Ms. Pierre under the headings "Deliberately Inflating Her Qualifications" and "Unprofessional Conduct as an Attorney." Among the allegations were that Ms. Pierre (1) had claimed to have courtroom experience that she did not have, (2) had made several statements during the campaign that were "untrue and misleading to voters," and (3) in the mid-1990s, had evaded service of process in a case and was taken into custody on a body attachment when she did not appear in court.

One of the recipients of Mr. McAuliffe's email was Bar Counsel, who received it as a member of the Montgomery County Bar Association. Mr. McAuliffe's email was sent at 3:48pm on Friday, August 28. At 4:47pm, Bar Counsel replied. Bar Counsel

11

(1) informed Mr. McAuliffe that she had opened an investigation to determine whether Ms. Pierre had violated any rules of professional conduct, (2) asked Mr. McAuliffe to provide "any information or documentation in [his] possession that support[ed] any allegation that Ms. Pierre made false or misleading statements," and (3) asked him to identify individuals with personal knowledge of the allegations in his email. Bar Counsel informed Mr. McAuliffe that the investigation was confidential and asked that he maintain that confidentiality.

Mr. McAuliffe responded 30 minutes later thanking Bar Counsel for the email response "and for opening an investigation." He agreed to maintain the confidentiality of the investigation, but asked if he could inform the individual sitting judges about it, and offered to discuss the matter by phone. Subsequent correspondence references a telephone conversation that evening.

On Monday, August 31, the next business day, Mr. McAuliffe responded by providing the information Bar Counsel had requested.

On September 7, less than two months before the election, Bar Counsel sent Ms. Pierre a letter stating that a complaint had been docketed in Bar Counsel's name based on Mr. McAuliffe's email and that "an investigation will be conducted[.]" In the letter, Bar Counsel asked that Ms. Pierre respond in writing to 12 different inquiries and provide documentation to support her responses. For example, after identifying two statements Ms. Pierre allegedly made about the consequences of voting for the sitting judges, Bar Counsel wrote:

12

> Please provide all information and documentation to support your statement that any firm would control "Justice" in the Circuit Court for Montgomery County. Please also state whether your tweets should be read as an accusation that the sitting judges are, or will be, in violation of Rule 18-102.4(b) or (c).

And after identifying tweets by Ms. Pierre sent in the aftermath of the death of George Floyd, Bar Counsel wrote:

> Please state with specificity what you contend the public could expect to "hear" from sitting judges regarding the death of George Floyd and associated proceedings that would not violate Rule 18-102.10.

and:

> If you contend that an arrestee can be "presumed of committing murder" and that the burden of proof is on a criminal defendant to "prove that they are not guilty of contributory negligence and involuntary manslaughter" are accurate statements of the law, please provide all authority to support your position.

Bar Counsel requested a response by September 21.

Ms. Pierre put her malpractice carrier, CNA, on notice of the investigation. CNA opened a claim file on September 15, 2020 identifying "J McAuliffe III" as the claimant against Ms. Pierre. Ms. Pierre did not respond to Bar Counsel's letter by September 21. When Bar Counsel followed up the next day, Ms. Pierre requested additional time to see if her carrier would retain counsel for her. In several subsequent email exchanges, Bar Counsel continued to request a response to the original letter, while Ms. Pierre said she was still waiting for an answer from CNA and did not want to respond without an attorney. Bar Counsel also sought dates to take Ms. Pierre's statement under oath, to which Ms. Pierre did not respond. Ms. Pierre, through counsel (not retained by CNA), ultimately

responded to Bar Counsel's September 7 letter on December 4 and sat for a statement under oath on December 18.

In November 2021, after completing the investigation, Bar Counsel filed a petition for disciplinary or remedial action. A four-day hearing was scheduled to begin in April 2022. However, this Court granted Ms. Pierre's emergency motion to stay the proceedings to consider questions related to discovery disputes and the effect of recent changes to the Rules. We lifted the stay on May 11, 2022 after changes to Rule 19-726 rendered the discovery issue moot. After a four-day merits hearing in September 2022, the hearing judge issued a written opinion containing findings of fact and conclusions of law.

## C. *The Hearing Judge's Findings of Fact*

The hearing judge's findings of fact address five categories of alleged misconduct by Ms. Pierre: (1) misrepresentations about sitting judges; (2) misrepresentations about her own experience; (3) misrepresentations about events that transpired in a lawsuit against her in the mid-1990s; (4) misrepresentations about her employment in the early 1990s at a company called Network Engineering, Inc.; and (5) her misrepresentations to Bar Counsel and failure to cooperate with the investigation. We address each category in turn.

### 1. *Misrepresentations About Sitting Judges*

The Commission alleged misconduct associated with three statements Ms. Pierre made about sitting judges during the campaign.

First, on May 20, 2020, Ms. Pierre's campaign Twitter account posted:

> Also there are some sitting judges who are only English speakers send people to jail because they could not speak English and discriminate

14

against people based on skin color, country of origins, religious backgrounds or sexual orientations. Moco is cosmopolitan & need more!

At the hearing, Ms. Pierre acknowledged that the statement was false. She testified that the impetus for the tweet was her mistaken recollection of Child in Need of Assistance ("CINA") hearings in 2004 and 2005 during which she had misremembered a circuit court judge threatening her client with contempt if the client did not learn English. In fact, the judge—who was no longer an active judge at the time of the tweet—had ordered Ms. Pierre's non-English speaking client to attend English class as part of a reunification plan, and the judge did not threaten or take any disciplinary action when the client failed to attend the class. Ms. Pierre also argued that she did not send out the tweet, although she acknowledged that her campaign did and that she supplied the information on which it was based. The hearing judge found that Ms. Pierre authorized the tweet, that it was false, and that Ms. Pierre knew it was false or acted with reckless disregard at the time.

Second, on May 23, 2020, Ms. Pierre's campaign Twitter account posted:

The Sitting Judges are somewhat diverse in that they are black, Asian, gay, and straight, and men and women. But they are not really diverse. They are an in-group. Most of them have worked at the same law firm, go to the same church, and are related by marriage.

At the hearing, Mr. McAuliffe testified based on personal knowledge that the statement that "[m]ost" of the sitting judges worked at the same law firm, went to the same church, and were related by marriage was false, both as to the four sitting judges running for reelection and as to the bench as a whole. As with the first tweet, Ms. Pierre claimed that she had not posted it herself. Unlike with the first tweet, Ms. Pierre asserted that this statement was an accurate reflection of her opinion or belief. The only support she

15

identified for the statement was: (1) a claim that a member of the bar told her that four judges on the bench attended the same church; and (2) that she had overheard someone else say that one of the sitting judges was related by marriage to another.[14] The hearing judge found that Ms. Pierre was responsible for the tweet, that it was false, and that Ms. Pierre acted with reckless disregard at the time.

---

[14] Ms. Pierre also introduced an exhibit at the hearing, Respondent's Exhibit P, which purported to show connections by law firm or familial relationship among current and former members of the bench from Montgomery County. Exhibit P identified:

- Two judges as having worked at Miles & Stockbridge, Rachel McGuckian and Rosalyn Tang. However, although both were judges at the time of the 2022 hearing, neither had been appointed at the time of the campaign tweet and only one was ever on the circuit court.
- Three judges and the spouses of two other judges as having worked at Debelius, Clifford, Debelius, Crawford & Bonifant. However, of the three judges, one (John Debelius) had retired from the circuit court in 2017 and a second (Gary Crawford), who was never a circuit court judge, retired from the District Court of Maryland in 2011.
- Two judges as having worked at Paley Rothman. However, only one of those judges had been appointed at the time Ms. Pierre sent her tweet. The other, Kathleen Dumais, was not appointed until December 2021.
- Two judges as having worked for the law firm Ethridge, Quinn, Kemp, McAuliffe, Rowan & Hartinger. However, one of those judges, again Judge Dumais, was not appointed until December 2021.
- Eight judges as "Related." However, the only purported relationship identified among active judges on the circuit court bench was between Judges Christopher Fogleman and John Maloney, who the exhibit claimed were "[r]elated by marriage per sources at Judge Fogleman's investiture."

Exhibit P thus (1) did not identify a single law firm in common between even two active judges at the time of Ms. Pierre's tweet, and (2) identified, based on an anonymous source, only one familial relationship between two sitting judges. (Information about the dates of service of the judges mentioned above can be found on the Maryland Manual Online, available at https://msa.maryland.gov/msa/mdmanual/html/mmtoc.html.

Third, Ms. Pierre's campaign made several references to a statement Judge Berry had made at a campaign forum. During the forum, Judge Berry was asked about a study that identified high incarceration rates of Black men in the State. Judge Berry responded:

> What we do, is there are a lot of correctional options other than incarceration. We're not incarcerating people who are non-violent offenders for long periods of time or anything like that. There is home detention, there's inpatient residential treatment, there's problem solving courts, there's work release or weekend incarceration. There are a lot of things you can do. So, we're not . . . certainly, I understand that it is an issue, but it's not as much of an issue as being portrayed by the other two candidates[15] . . . .

Ms. Pierre attended the forum. Her campaign later sent a text message to prospective voters that read, "When a sitting judge says 'it's not much of an issue' that Black males are jailed at a higher rate in MD it's clear we need Marylin Pierre, who understands restorative justice." Her campaign made similar statements elsewhere, including after Mr. McAuliffe emailed her complaining that her use of the quote was out of context and misleading. In some of those statements, she corrected her omission of the word "as" from the quoted language; in at least one other, she did not.

At the hearing, Ms. Pierre acknowledged that her use of the quote without including "as" before "much" was incorrect but said that was what she had heard and that the inaccuracy was an oversight. Noting that Ms. Pierre had republished the statement after

---

[15] "[T]he other two candidates" appears to be a reference to Ms. Pierre and a second challenger, Thomas P. Johnson, III, whose name was not on the ballot but who was running as a write-in candidate. *See* Official 2020 Presidential General Election results for Montgomery County (last updated Dec. 4, 2020) available at: https://elections.maryland.gov/elections/2020/results/general/gen_results_2020_4_by_county_16-1.html, *archived at* https://perma.cc/NER7-8PAH.

being informed that it was inaccurate, the hearing judge found that Ms. Pierre had knowingly and intentionally misrepresented the substance of the quote.

### 2. *Misrepresentations About Ms. Pierre's Experience*

The Commission also alleged that Ms. Pierre knowingly and intentionally misrepresented her legal experience in her campaign statements and in her answers to questionnaires submitted in connection with her eight applications for a judgeship.

### a. Campaign Statements

The Commission cited two instances from the campaign in which it alleged that Ms. Pierre had misled voters about her experience and qualifications. First, in a campaign text to Montgomery County voters, Ms. Pierre stated that she has practiced "civil and criminal law in Maryland's trial and appellate courts." Interpreting that statement as a representation that she had practiced civil law in both trial and appellate courts, and criminal law in both trial and appellate courts, the Commission asserted that it was a knowing and intentional misrepresentation because Ms. Pierre had never represented a client in a criminal matter in an appellate court. Second, during a candidate forum, Ms. Pierre stated that she had "represented clients in hundreds of cases in state and federal trial and appellate courts, [and that] some of [her] cases have established precedents in the State of Maryland and are regularly cited by courts in other states." The Commission contended that the statement was a knowing and intentional misrepresentation because Ms. Pierre had not represented a client in a federal appellate court and had not represented a client in a Maryland appellate court that had resulted in a reported opinion.

18

The hearing judge found that Ms. Pierre's statements were "essentially true" because Ms. Pierre had practiced both civil and criminal law, had practiced in both trial and appellate courts, had practiced in both federal and state courts, had represented clients in hundreds of cases, and had handled cases at the trial level that had later resulted in reported appellate opinions. The hearing judge declined to "undertake the parsing and/or dissection [of Ms. Pierre's words] required to accept [the Commission's] analysis on this issue."

### b. Judicial Questionnaires

The Commission also alleged that Ms. Pierre misrepresented the scope of her legal experience in each of the eight questionnaires she submitted in applying for judgeships between March 2012 and August 2017.[16] In each of those questionnaires, Question 16 asked applicants, with respect to each of five subparts, about their experience "[w]ith respect to the last five years." The Commission alleged that Ms. Pierre's answers were false and misleading. With respect to the entirety of Question 16, instead of confining her responses to information about the most recent five years, Ms. Pierre included her entire career. She testified that she had misread Question 16 when completing the first

---

[16] Applicants for a judicial vacancy are required to submit a confidential personal data questionnaire that asks for detailed information about an applicant's personal history, education, law practice, business and civic involvement, any disciplinary history either as a party in a legal matter or in professional life, and other questions relevant to an application for a judicial vacancy. *See* Maryland Courts, *How to Apply for a Judicial Vacancy*, https://www.courts.state.md.us/judgeselect/judgeappl (last visited August 10, 2023), *archived at* https://perma.cc/VM5X-UPNG.

questionnaire in 2012, and then simply updated the information on subsequent questionnaires to add additional experience.

The Commission also alleged that Ms. Pierre made further false representations concerning her experience in response to subparts (b), (c), (d), and (e) of Question 16 on all eight questionnaires. In subpart (b), applicants were asked what percentage of their appearances were in specified types of courts. Ms. Pierre's answers, which varied across the eight questionnaires, ranged from 0-3% of matters in federal court, 0-5% in state appellate court, 55-70% in state circuit court, 10-30% in the District Court of Maryland, and 10-20% in other courts. The hearing judge determined that a correct response in each case would have been that more than 99% of her cases were in state circuit courts, and so found that Ms. Pierre's answers were false. However, given the "wildly inconsistent" responses, and observing that Ms. Pierre had in the past represented clients in appellate cases and federal cases, the hearing judge concluded that if Ms. Pierre had intended to mislead, her answers "would not have been so carelessly inconsistent." On that basis, the hearing judge determined that her misrepresentations were not knowing and intentional.

In subpart (c), applicants were asked to identify the percentage of their litigation that was civil or criminal. In her first three questionnaires, Ms. Pierre responded that 75% of her cases were civil. That percentage went up to 85% in the next three questionnaires and 90% in the final two. The hearing judge found those answers to be false because the correct response on every questionnaire would have been that her practice was more than 99% civil. However, based on the same rationale applied to the subpart (b) responses, the

20

hearing judge concluded that Ms. Pierre's misrepresentations were not knowing and intentional.

In subpart (d), applicants were asked to identify "the number of cases [the applicant] tried to verdict or judgment (rather than settled)" and whether the applicant was "sole counsel, chief counsel, or associate counsel." In her first questionnaire, Ms. Pierre responded that she had "tried over five hundred cases to verdict or judgment." In her second questionnaire, that response went down to "over 430," and then progressively increased back to "over 500" by her final questionnaire. At the hearing, Ms. Pierre testified that she thought the question encompassed any cases in which a judge had issued any decision, including if an agreement by the parties to settle resulted in a dismissal of the case by the court. She further testified that she provided what she believed to be a conservative estimate of such cases, albeit for her entire career rather than just the most recent five years. The hearing judge rejected that explanation, finding that an experienced attorney like Ms. Pierre could not misunderstand the meaning of "tried to verdict or judgment" and that it was inconceivable that she had tried that many cases to verdict or judgment. On that basis, the hearing judge concluded that Ms. Pierre's responses were knowingly and intentionally false "for the purpose of bolstering her judicial applications."

In subpart (e), applicants were asked to identify the percentage of their cases that involved jury trials. In her first three questionnaires, Ms. Pierre responded 5%. In her last five questionnaires, she responded 1%. Finding that Ms. Pierre had handled only two jury trials in her entire career, both before 1996, the hearing judge concluded that her responses were false. The hearing judge further found that Ms. Pierre's responses were knowing and

21

intentional misrepresentations because the judge "[could ]not accept that [Ms. Pierre] did not recall that she had had only two jury trials throughout her career[.]"

### 3. Misrepresentations Concerning a Student Loan Case and Associated Failure to Appear, Body Attachment, and Detention

The Commission alleged that Ms. Pierre made knowing and intentional misrepresentations in her questionnaire responses and in her 1999 New York Bar Application regarding a student loan case against her in the mid-1990s. The underlying facts concern a lawsuit filed in November 1993 by the New York State Higher Education Services Corporation ("N.Y. Higher Education") against Ms. Pierre in the Circuit Court for Montgomery County. In the lawsuit, N.Y. Higher Education alleged that Ms. Pierre had defaulted on promissory notes associated with her student loans. After Ms. Pierre defaulted on payments owed pursuant to a settlement payment plan and the court entered a judgment against her, she failed to appear in court in response to a show cause order. The court issued a writ of body attachment, and Ms. Pierre was taken into custody by the sheriff. Ms. Pierre testified that she had failed to appear due to a personal tragedy. She posted bail and was released the same day. On March 25, 2004, N.Y. Higher Education filed a line of satisfaction.

### a. Ms. Pierre's Judicial Applications

The Commission alleged that in her responses to questions on seven of her eight judicial questionnaires, Ms. Pierre knowingly and intentionally failed to disclose facts concerning her failure to respond to the show cause order, the issuance of the writ of body attachment, and her detention by the sheriff. First, Question 28 called upon applicants to

22

disclose whether they had "ever been arrested, charged, or held by federal, state, or other law enforcement authorities for violation of any federal law or regulation, state law or regulation, or county or municipal law, regulation or ordinance." On her first questionnaire, from 2012, Ms. Pierre responded that a body attachment had been filed against her for nonpayment of her student loans and that she had been detained on July 1, 1996. She did not disclose the incident in response to Question 28 on the subsequent seven questionnaires. The hearing judge accepted Ms. Pierre's testimony that, after the first questionnaire, she interpreted Question 28 to relate only to criminal proceedings. Finding that interpretation to be reasonable, the hearing judge found that Ms. Pierre's failure to disclose was not a knowing and intentional misrepresentation.

Second, Question 29 called upon applicants to "[g]ive particulars of any litigation, including divorce, in which you personally are now or previously have been either a plaintiff or defendant. For each, list the dates, the names of the moving parties, the number of the case, the court, and the grounds for the litigation." In all eight questionnaires, Ms. Pierre disclosed: "New York State Higher Education filed a suit for nonpayment of student loans against me on November 16, 1993. I was able to pay them off and they filed a Line of Satisfaction on March 25, 2004." The hearing judge found that Ms. Pierre's response to Question 29 was "sufficient" and so not a knowing and intentional misrepresentation.

Question 32 asked if there was "any other information concerning [her] background that might be considered detrimental or that otherwise should be taken into consideration by the Commission[.]" On each of the eight questionnaires, Ms. Pierre answered no. With

respect to the seven questionnaires after the first, the hearing judge found that, because Ms. Pierre did not disclose "her failure to appear, the Show Cause Order and the Body Attachment in the Higher Education case in response to Questions 28 or 29, . . . she was required to disclose the detrimental information in response to Question 32[.]" The hearing judge did not identify the basis for the implicit conclusion that Ms. Pierre understood that the incident, which had occurred in 1996 and which she blamed on a personal tragedy, would be considered detrimental to her fitness for the bench in 2013 through 2017.

### b. Ms. Pierre's New York Bar Application

The Commission also alleged that Ms. Pierre made knowing and intentional misrepresentations by providing incomplete information about the student loan case in response to Questions 16 and 17(b) on her New York Bar Application. Question 16 asked, in relevant part, whether Ms. Pierre had "ever been arrested, taken into custody, charged with, indicted, convicted or tried for, or pleaded guilty to, the commission of any felony or misdemeanor or the violation of any law or ordinance, except traffic or parking violations[.]" Ms. Pierre answered no. As with Question 28 on the judicial questionnaires, the hearing judge accepted Ms. Pierre's testimony that she believed the question applied only to criminal proceedings. The hearing judge found that interpretation reasonable.

Question 17(b) asked whether Ms. Pierre had "ever failed to answer any ticket, summons or other legal process served upon [her] at any time" and "[i]f so, was any warrant, subpoena or further process issued against [her] as a result of [her] failure to respond to such legal process?" Ms. Pierre answered "yes," identified the student loan case, and explained that she had a court date related to nonpayment of student loans for

24

which she was sent a summons and did not appear because she was hospitalized and forgot. She further stated: "A summons was sent to my house and I answered it to the Court's satisfaction. No further action was taken on the summons since I have made arrangements to pay the student loan." The hearing judge concluded that response was a knowing and intentional "misrepresent[ation] by omission that the court issued a writ of body attachment for her failure to appear in response to a show cause order, and that she was detained and brought to court by the Sheriff and charged." Having made that finding, the hearing judge also "f[ound] that [Ms. Pierre] falsely swore that her answers were complete and truthful when she signed the Bar Application[.]"

### 4. *Misrepresentations About Ms. Pierre's Employment with Network Engineering*

The Commission alleged that Ms. Pierre had made knowing and intentional misrepresentations in her judicial applications and during a statement under oath in December 2020 about her prior employment in the late 1990s with Network Engineering. Question 14 on each of the eight judicial questionnaires asked for a chronological description of the applicant's "law practice and experience after . . . graduation from law school[.]" As part of her description, Ms. Pierre included that she had served as "corporate counsel" for Network Engineering from December 1997 through August 1999. She testified to the accuracy of that information during her statement under oath made in December 2020.

At the hearing, Ms. Pierre again testified that the information about her employment with Network Engineering was accurate. In response to a question about why she had not

25

disclosed that position on her 1999 New York Bar Application in response to a question asking the applicant to identify any "law firm, law department or legal institution" in which she had worked, Ms. Pierre testified that the position had not been part of a law firm, law department, or legal institution. The hearing judge found that Ms. Pierre's testimony was not credible because Ms. Pierre "was unable to describe, with any detail, any legal work she claims to have performed as 'corporate counsel'" and because the judge believed Ms. Pierre should and would have disclosed that role on her New York Bar Application if it were correct. On that basis, the hearing judge found that Ms. Pierre knowingly and intentionally misrepresented her position with Network Engineering on her judicial applications and in her statement under oath.

### 5. *Misrepresentations to Bar Counsel and Failure to Cooperate with Investigation*

The Commission alleged that Ms. Pierre failed to cooperate with Bar Counsel's investigation. As discussed above, Bar Counsel initiated correspondence with Ms. Pierre on September 7, 2020, less than two months before the election. Bar Counsel's five-page letter set forth 12 numbered paragraphs: (1) nine paragraphs identified statements or categories of statements made by Ms. Pierre or her campaign and asked that she explain or substantiate the basis for the statements; (2) one paragraph inquired whether during a particular online campaign forum Ms. Pierre had been asked whether she had ever been taken into custody and what her answer was; (3) one paragraph asked whether she had disclosed information about her evasion of service, the writ of body attachment, and her detention as part of the student loan litigation on her judicial questionnaires; and (4) the

final paragraph asked for documentation of five endorsements she claimed to have received. The letter asked that Ms. Pierre provide the information and documentation by September 21. When Ms. Pierre did not meet that deadline, Bar Counsel sent follow-up requests on September 22 (requesting a response by September 29), October 4 (requesting a response by October 9), October 16 (requesting a response), and November 6 and 9 (requesting that Ms. Pierre provide dates to make a statement under oath).

From September 23 through November 9, Ms. Pierre corresponded with Bar Counsel to seek more time to obtain counsel, which she was initially hoping would be provided by her malpractice carrier, CNA. On November 9, Ms. Pierre informed Bar Counsel that CNA had denied her request and that she was in the process of obtaining other representation. On November 19, not having received dates from Ms. Pierre, Bar Counsel scheduled a statement under oath for December 18 and emailed Ms. Pierre a copy of a subpoena.

On December 4, Ms. Pierre, through counsel, responded substantively to the inquiries contained in Bar Counsel's September 7 letter. She also sat for the statement under oath on December 18. At the hearing, Ms. Pierre testified that she spoke with CNA several times while awaiting its response and that she learned that CNA was denying coverage on November 2, which was the day before the election. The hearing judge, observing that Ms. Pierre had sent Bar Counsel an email on November 6 stating that she was still waiting to hear from CNA, found Ms. Pierre's testimony to not be credible. The hearing judge further found that Ms. Pierre "knowingly and intentionally delayed responding to Bar Counsel's requests for information without excuse."

27

### D. *The Hearing Judge's Conclusions of Law*

The hearing judge concluded that Ms. Pierre violated:

- MARPC 8.1(a) and (b) (Bar Admission and Disciplinary Matters), when she: (1) "unequivocally testified falsely during her statement under oath on December 18, 2020 that she worked as general counsel for Network Engineering"; (2) signed her New York Bar Application in March of 1999 attesting to its accuracy; and (3) "failed to timely respond to Bar Counsel's requests for information made on September 7, 2020, September 22, 2020, and October 4, 2020[,] and when she failed to provide available dates for her statement under oath."

- MARPC 8.2(a) and (b) (Judicial and Legal Officials), when she made statements that "were either knowingly false or made with reckless disregard as to their truth or falsity" and "were made for the specific purpose of misleading voters about both [her] credentials and the qualifications and integrity of the sitting judges."

- MARPC 8.4(a), (b), (c), and (d) (Misconduct), when she violated other rules of professional conduct and when she "knowingly and intentionally testified falsely," "chose to misrepresent her qualifications for her personal gain" on both her judgeship applications and in her campaign materials, and "made numerous misrepresentations by omission" by not disclosing certain details of her 1996 court case.

- NYDR 1-101 (Maintaining Integrity and Competence of the Legal Profession), when she failed to disclose on her New York Bar Application the details of her 1996 student loan case, including that "the court issued a writ of body attachment for her failure to appear in response to a show cause order, that she was detained and brought to court by the Sheriff[,] and that she was required to post a bond."

- NYDR 1-102 (Misconduct), "when she falsely swore that her answers were complete and truthful when she signed the [New York] Bar Application[.]"

## DISCUSSION

### I. EXCEPTIONS TO THE HEARING JUDGE'S FINDINGS OF FACT

"This Court has original and complete jurisdiction in attorney discipline proceedings and conducts an independent review of the record." *Attorney Grievance*

*Comm'n v. Bonner*, 477 Md. 576, 584 (2022). "The hearing judge's findings of fact are left undisturbed unless those findings are clearly erroneous or either party successfully excepts to them." *Attorney Grievance Comm'n v. Fineblum*, 473 Md. 272, 289 (2021) (quoting *Attorney Grievance Comm'n v. Ambe*, 466 Md. 270, 286 (2019)).

Bar Counsel did not file any exceptions. Having reviewed the record thoroughly, we find no error in the hearing judge's findings of fact that favored Ms. Pierre and so will not disturb them. Ms. Pierre filed a lengthy document that we interpret as excepting to all of the hearing judge's findings of fact and conclusions of law that were adverse to her. Because Ms. Pierre does not tie most of her exceptions directly to specific findings of fact, we will address them generally as they relate to the five categories of misconduct set forth above.

### A. Misrepresentations About Sitting Judges

#### 1. *Background Legal Principles*

As noted at the outset of this opinion, several aspects of the context in which this matter has arisen will prove critical to our resolution of Ms. Pierre's exceptions and our consideration of appropriate discipline for the violations we sustain. We therefore begin with a discussion of background legal principles that help define the standards that apply to the hearing judge's findings and conclusions.

In *Attorney Grievance Commission v. Stanalonis*, 445 Md. 129 (2015), we discussed the significance of the election context in assessing claims of violations of the MARPC. We explained that the election context was important for three reasons. "First, as the [United States] Supreme Court has observed, 'speech about the qualifications of candidates

29

for public office,' including judicial candidates, is 'at the core of our First Amendment freedoms.'" *Id.* at 140 (quoting *Republican Party of Minnesota v. White*, 536 U.S. 765, 774 (2002)). Such speech "is core political speech and has the highest level of First Amendment protection." *Stanalonis*, 445 Md. at 140-41. "Second, the election context is significant as there inevitably is some imprecision in language used during the heat of a political campaign." *Id.* at 141. Short timeframes in which to respond, "limited time to vet language," and a natural preference for "a short and snappy one-liner" over lengthier explanations with more context are features of elections that courts must take into account in assessing whether statements violate the MARPC. *Id.* at 141-42. Third, because MARPC 8.2(a) also regulates statements made about "public legal officers," including the Attorney General and State's Attorneys, "whatever we hold [with respect to judicial campaigns] will also control what a lawyer may say about a candidate for election" to those other offices. *Id.* at 142.

This matter involves not just an election contest, but an election for a judicial position, which adds important context of its own. MARPC 8.2(a) provides: "An attorney shall not make a statement that the attorney knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office." As we have noted, "the purpose of [MARPC] 8.2(a) is not to protect judges, judicial officers, or public legal officials from unkind or undeserved criticisms. Rather, [MARPC] 8.2(a) protects the integrity of the judicial system, and the public's confidence therein[.]" *Attorney Grievance Comm'n v. Frost*, 437 Md. 245, 263 (2014); *see* MARPC

30

8.2 cmt. 1 ("Assessments by attorneys are relied on in evaluating the professional or personal fitness of individuals being considered for election or appointment to judicial office and to public legal offices . . . . [F]alse statements by an attorney can unfairly undermine public confidence in the administration of justice.").

To ensure that enforcement of MARPC 8.2(a) does not infringe on core speech rights, a high standard is embedded within that rule, which encompasses only speech that is false and made with knowledge of its falsity or with reckless disregard as to its truth or falsity. As we observed in *Stanalonis*, "[i]n the First Amendment context, 'reckless disregard for truth or falsity' evokes the subjective test for civil liability for defamation of a public figure set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)." 445 Md. at 143. Under that test, "reckless disregard" demands more than just a conclusion that a reasonable person would have refrained from making the comment or performed additional investigation. That standard demands that the plaintiff produce "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the defendant's] publication."[17] *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Nonetheless, as we highlighted in *Stanalonis*: "Every Maryland attorney takes an oath to act 'fairly and honorably.' Those who seek judicial office must resist the temptation to advance at the risk of violating that pledge." 445 Md. at 149 (footnote omitted).

---

[17] As we observed in *Stanalonis*, there is disagreement among the states concerning whether an objective or subjective test should apply in attorney discipline cases. 445 Md. at 143. As in that case, we need not resolve that disagreement here because it would not be dispositive as to the statements at issue.

31

One additional point bears on our assessment of Ms. Pierre's exceptions to the hearing judge's findings of fact. As she correctly points out, in assessing both whether a statement is false and whether the speaker had knowledge of its falsity or acted with reckless disregard thereof, there is an important distinction between statements of fact and statements of opinion. "Under the First Amendment there is no such thing as a false idea. . . . But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974) (quoting *Sullivan*, 376 U.S. at 270). Although statements of opinion are generally not subject to being proven false, statements of fact are. Moreover, statements of opinion, even those widely viewed as erroneous or unfair, are both less likely to mislead and more valuable to protect in the service of free and open public discourse than are false statements of fact. *See id.* It is therefore false statements of fact that are the subject of MARPC 8.2(a) and analogous provisions in other states. *See, e.g.*, *Matter of Callaghan*, 796 S.E.2d 604, 628 (W. Va. 2017) (finding judicial candidate's materially false statements on campaign flyer impugning opponent were not protected by First Amendment and violated rules of professional conduct); *In re O'Toole*, 24 N.E.3d 1114, 1126 (Ohio 2014) ("Lies do not contribute to a robust political atmosphere, and 'demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements.'" (quoting *Brown v. Hartlage*, 456 U.S. 45, 60 (1982))); *In re Chmura*, 608 N.W.2d 31, 33 (Mich. 2000) (finding canon of judicial conduct restricting false or misleading public communications

32

by judicial candidates unconstitutionally overbroad before narrowing it to prohibit only "knowingly or recklessly using forms of public communication that are false").

### 2. The Statements at Issue

The hearing judge concluded that clear and convincing evidence established that three different campaign statements made by Ms. Pierre were false and that Ms. Pierre either knew they were false or made them with reckless disregard for their truth or falsity. We address each in turn.

First, with respect to the tweet that "some sitting judges who are only English speakers send people to jail because they could not speak English," Ms. Pierre conceded before the hearing judge that the statement is false, and the record establishes that it is. Ms. Pierre contends, however, that her campaign's tweet was not knowingly and intentionally misleading, or made with reckless disregard as to its truth or falsity, because it was based on her mis-recollection of a proceeding in which a judge had ordered her client to take English classes as part of a CINA reunification plan. She also suggests that her tweet was protected as a statement of opinion, rather than fact. We find no clear error in the hearing judge's findings. First, even if Ms. Pierre's recollection about the single incident were accurate, it would have provided no support for her campaign's tweet. Second, other than that mistaken recollection, Ms. Pierre offered no basis at all for the tweet. Third, a statement that judges send people to jail because they do not speak English is a statement of fact, subject to demonstrable verification, not a statement of opinion. Whether viewed through an objective or subjective lens, the record supports the hearing judge's finding that Ms. Pierre, at a minimum, acted with reckless disregard for the truth

33

or falsity of her statement at the time she made it. We therefore overrule Ms. Pierre's exceptions to the hearing judge's findings of fact concerning her campaign's tweet about judges sending people to jail for not speaking English.

Second, with respect to the tweet that "[m]ost" of the sitting judges "have worked at the same law firm, go to the same church, and are related by marriage," Ms. Pierre excepts to all of the hearing judge's findings of fact. We overrule those exceptions. Ms. Pierre first contends that the statement is one of opinion, which she sincerely held, rather than one of fact. In making that argument, Ms. Pierre recasts the statement as a general allegation that the sitting judges are not diverse and are all part of "an in-group." Notably, however, the same tweet includes two other sentences that state exactly that— that the sitting judges "are not really diverse" and "are an in-group." Those sentences were not the basis for either the Commission's charges or the hearing judge's findings. A statement that "[m]ost" sitting judges have worked at the same law firm is a statement of fact subject to objective verification. The same is true of statements that "[m]ost" sitting judges go to the same church and are related by marriage. At trial, Mr. McAuliffe testified from personal knowledge that all three contentions were false, and Ms. Pierre did not provide evidence that any of them were true.

Ms. Pierre also argues that the hearing judge erred in finding that she knew the statements were false or acted with reckless disregard for their truth or falsity at the time they were made. We disagree. At the hearing, Ms. Pierre identified the sole bases for her purported belief that her statement was true at the time she made it as: (1) having overheard an anonymous source state that two active judges and one retired judge were related by

34

marriage; and (2) having been told by a member of the bar that four (out of 23) active judges attend the same church. Ms. Pierre also contends that she identified a sufficient number of relationships among the active judges to provide general support for her belief that her statement was true. However, the comments on which she relies, even if true, would not come close to supporting her statement, and the general support she purports to have identified in her Exhibit P is sufficiently deficient, *see* discussion above at note 14, that it lends significantly more weight to the Commission than to her.

We therefore overrule Ms. Pierre's exceptions to the hearing judge's factual findings that Ms. Pierre's tweet about most sitting judges working at the same law firm, attending the same church, and being related (1) were false, and (2) were made knowing they were false or with reckless disregard for their truth or falsity.

Finally, Ms. Pierre also excepts to all of the hearing judge's findings concerning her several campaign statements about an answer Judge Berry gave at a candidate forum attended by Ms. Pierre. At that forum, when asked about a study identifying a high rate of incarceration of Black men in Maryland, Judge Berry provided an answer that discussed various alternatives to incarceration and concluded: "I understand that it is an issue, but it's not as much of an issue as being portrayed by [the other two candidates.]" *See* discussion above at 19. The first statement with which the Commission takes issue, which is representative of the others, is an October 20, 2020 text message stating:

> Hi [voter], this election matters. When a sitting judge says "it's not much of an issue" that Black males are jailed at a higher rate in MD it's clear we need Marylin Pierre, who understands restorative justice. Can we count on your support?

35

Mr. McAuliffe objected to Ms. Pierre's message on the grounds that it took Judge Berry's statement out of context and because it omitted the word "as" before "much," which he contended changed its meaning. Ms. Pierre took that statement down and posted a different one that included the "as," although in only one of two places where the quote appeared. Mr. McAuliffe again objected and demanded that the post be removed, stating: "Your adding the word 'as' to the portion of the quote . . . does not correct the intentionally misleading nature of your post but only serves to prove that your actions are deliberate misrepresentations." The hearing judge found that Ms. Pierre's campaign used other versions of the quote three more times, once including the "as," once not, and a third time shortening the quote to only "much of an issue."

At the hearing, Ms. Pierre testified that she had believed her initial quote was accurate based on what she heard Judge Berry say. She also testified that the omission of "as" in the subsequent statements was inadvertent. However, the hearing judge found that even if that were true, Ms. Pierre

> had a responsibility to completely and accurately correct her campaign literature once notified of her error on October 12, 2020. Instead, she republished the incomplete, misleading quote on October 13th, 17th, 23rd and 31st. The court finds that she knowingly and intentionally misrepresented the substance of Judge Berry's quote and repeatedly attributed the incomplete, misleading quote to Judge Berry.

The hearing judge thus concluded that, more than the omission of the word "as"—which was not missing from all the communications identified—Ms. Pierre violated the MARPC by failing to provide "complete[] and accurate[]" context for the statement.

36

Ms. Pierre excepts to the hearing judge's findings concerning these communications on the grounds, among other things, that her omission of the word "as" did not change the context of the quote because her point was that the sitting judges were not taking seriously the high rate of incarceration of Black males in Maryland; that Ms. Pierre, by contrast, was a candidate "who understands restorative justice"; and that voters should therefore choose her.

In this case, the protection afforded by the First Amendment for this core political speech is not overcome. The comments at issue attempted to draw a distinction between Ms. Pierre and her opponents on an issue of significant public importance. Ms. Pierre's statements conveyed a message that she believed one of her opponents was minimizing the importance of that issue. That Ms. Pierre did not endeavor to provide full context for a statement she attributed to her opponent and did not get the quote completely accurate is neither commendable nor, in the context of an election, exceptional. The issue, however, is whether it is sanctionable as misconduct under the MARPC. As noted, "imprecision in language" is an inevitable feature of campaign speech. *Stanalonis*, 445 Md. at 141. The question before us is not whether the words within the quotation marks were a full and accurate transcript of that portion of Judge Berry's remarks. In some of the quotes they were and in some they were not. Nor is the question whether Ms. Pierre provided sufficient context around the quoted language to convey Judge Berry's point as Judge Berry originally made it. Ms. Pierre did not. The relevant question, instead, is whether, understanding the circumstances and the nature of campaign speech and the First Amendment interests that protect it, there is clear and convincing evidence that the

37

campaign statements at issue were knowingly and intentionally false or misleading. We do not find evidence in the record to meet that high standard. We therefore sustain Ms. Pierre's exceptions to the hearing judge's findings of fact concerning the statement attributed to Judge Berry.

### B. Misrepresentations About Ms. Pierre's Experience

Ms. Pierre excepts to the hearing judge's findings that she knowingly and intentionally misrepresented her legal experience for the purpose of bolstering her judicial applications in her responses to Question 16(d) and (e). As discussed above, the hearing judge concluded that Ms. Pierre did not knowingly and intentionally misrepresent her legal experience in responding to two other subparts of Question 16, subparts (b) and (c). The hearing judge concluded that Ms. Pierre's responses to those questions were so "wildly inconsistent" that she could not have had the intent to mislead. However, the hearing judge reached a different conclusion with respect to Ms. Pierre's answers to subparts (d) and (e).

Bar Counsel did not except to the hearing judge's findings with respect to subparts (b) and (c) of Question 16. Those findings are compelling. The inconsistency among responses from questionnaire to questionnaire, as well as the inconsistency between the responses and other information contained in the questionnaires about Ms. Pierre's practice, is much more consistent with sloppiness and inattentiveness than with a deliberate effort to mislead.

Ms. Pierre contends that her responses to subparts (d) and (e) share the same characteristics as her responses to subparts (b) and (c) and, for the same reasons, there is not clear and convincing evidence of a knowing and intentional effort to mislead. We

38

agree. In her responses to subpart (d), Ms. Pierre stated in her first questionnaire that she had handled "over five hundred" cases to trial or verdict. The number then went down to 430 in the next questionnaire before eventually climbing back to 500. And although the question called only for a list of cases handled to trial or verdict within the past five years, Ms. Pierre's responses, as the hearing judge found, could not possibly have been accurate across that timeframe. Similarly, in her initial responses to subpart (e), Ms. Pierre identified that 5% of her cases had involved jury trials, but later reduced that, all at once, to 1%. In both cases, the information provided by Ms. Pierre was inconsistent across questionnaires and inconsistent with other information contained in the questionnaires about her experience. The logic underlying the hearing judge's findings concerning subparts (b) and (c) compels the same result with respect to subparts (d) and (e). We therefore sustain Ms. Pierre's exceptions with respect to the hearing judge's findings concerning Question 16(d) and (e) of her judicial questionnaires.

### C.     Misrepresentations Concerning Student Loan Case

We turn next to Ms. Pierre's lack of disclosure that, in connection with the student loan litigation in the mid-1990s, she had failed to respond to a show cause order and was subsequently detained on a body attachment. For different reasons, the hearing judge found that Ms. Pierre's failure to disclose that information in response to Questions 28 and 29 on seven of her eight judicial applications did not constitute knowing and intentional misrepresentations. Bar Counsel did not except to that finding, and we agree that it is supported by the record. In addition to the reasons identified by the hearing judge, Ms. Pierre disclosed the issuance of the body attachment and her subsequent detention in

39

response to Question 28 on her first judicial questionnaire, submitted in March 2012. She could not reasonably have believed that information would not still be within the knowledge of, and fully accessible to, the members of the same judicial nominating commission when she submitted her next questionnaire the following year or, indeed, any of her subsequent questionnaires.[18]

The hearing judge reached a different conclusion with respect to Question 32, a catchall question that asked if there was "any other information concerning [the applicant's] background that might be considered detrimental or that otherwise should be taken into consideration by the Commission[.]" The hearing judge found that because Ms. Pierre did not disclose "her failure to appear, the Show Cause Order and the Body Attachment in the Higher Education case in response to Questions 28 or 29 [in her last seven questionnaires], . . . she was required to disclose the detrimental information in response to Question 32[.]" For three reasons, we conclude that the record does not contain clear and convincing evidence to support the hearing judge's finding.

_____

[18] Ms. Pierre's first five judicial applications, spanning dates from March 5, 2012 through September 26, 2014, were filed during the second term of Governor Martin O'Malley. According to the Maryland Manual, 11 of the 13 members of the Trial Courts Judicial Nominating Commission for Montgomery County were the same from at least August 9, 2011 through July 21, 2014. *See* Maryland Manual On-Line, 2011, Trial Courts Nominating Commissions (Aug. 9, 2011) available at: http://2011.mdmanual.msa.maryland.gov/msa/mdmanual/26excom/html/22jnomt.htm l (identifying members of the 11th Commission District as of August 9, 2011), *archived at* https://perma.cc/2FVB-5782; Maryland Manual On-Line, 2014, Trial Courts Nominating Commissions (July 21, 2014) available at: http://2014.mdmanual.msa.maryland.gov/msa/mdmanual/26excom/html/22jnomt.html (identifying members of the Commission as of July 21, 2014), *archived at* https://perma.cc/L2N6-BK5G.

First, implicit in that finding is a determination that Ms. Pierre would necessarily have viewed her brief detention on a body attachment approximately two decades earlier, as part of student loan litigation that was fully resolved approximately one decade earlier, as something "detrimental" to her fitness for the judgeships she was seeking. Unlike Questions 28 and 29, Question 32 is subjective, requiring applicants to reach conclusions as to whether aspects of their background "might be considered detrimental" or "should be taken into consideration by the Commission." The hearing judge did not cite any basis in the record to conclude that Ms. Pierre viewed that information as detrimental to her fitness for judicial office. To the contrary, Ms. Pierre explained that the circumstances that led to the body attachment and her detention were attributable to a personal tragedy she endured at the time. Given the subjectivity of Question 32 and the lack of any evidence to the contrary, the record does not support a conclusion by clear and convincing evidence that Ms. Pierre viewed those matters as detrimental to her candidacy.

Second, as noted above, Ms. Pierre disclosed the body attachment and detention in her answer to Question 28 on her first judicial questionnaire, which she submitted in March 2012. Her second was submitted in October 2013, and she submitted six more through August 2017. After her disclosure in the first questionnaire, she could not reasonably have believed that failing to mention it in her second and subsequent questionnaires would keep knowledge of it from the members of the very same judicial nominating commission.

Third, as the hearing judge noted, Ms. Pierre disclosed the student loan case itself on the seven questionnaires at issue in response to Question 29. A simple check of Judiciary Case Search reveals that the court issued a body attachment and delivered it to

41

the sheriff on June 21, 1996, that the sheriff's return was filed on July 1, 1996, that Ms. Pierre appeared in court that day with a public defender, that the court set a $500 bond, and that Ms. Pierre paid it on July 10, 1996. *See* Maryland Judiciary, *Case Search*, https://casesearch.courts.state.md.us/casesearch/. Knowing that the judicial nominating commission was investigating her background based on the information provided in the questionnaire, her identification of the litigation in response to Question 29 is inconsistent with the finding that her failure to disclose easily uncovered details about it in response to Question 32 constituted a knowing and intentional misrepresentation by omission.

For all those reasons, we conclude that the record cannot support the finding, by clear and convincing evidence, that Ms. Pierre's responses to Question 32 on her judicial questionnaires constituted knowing and intentional misrepresentations by omission. Accordingly, we sustain Ms. Pierre's exception to that finding.

The hearing judge also found that Ms. Pierre made knowing and intentional misrepresentations by omission when she provided incomplete information about her student loan case in her response to Question 17(b) on her application for the New York Bar. That question asked whether Ms. Pierre had "ever failed to answer any ticket, summons or other legal process served upon [her] at any time" and "[i]f so, was any warrant, subpoena or further process issued against [her] as a result of [her] failure to respond to such legal process?" Ms. Pierre's answer identified the case and acknowledged that she had failed to appear in response to a summons. She further stated: "A summons was sent to my house and I answered it to the Court's satisfaction. No further action was taken on the summons since I have made arrangements to pay the student loan." The

42

hearing judge concluded that Ms. Pierre knowingly and intentionally provided a misleading response to Question 17(b). Ms. Pierre excepts to that finding.

Question 17(b) and Ms. Pierre's response to it are different from Question 32 on the judicial questionnaires and Ms. Pierre's responses to it in two critical respects. First, unlike the subjective nature of Question 32, Question 17(b) called for the disclosure of specific, factual information: whether "any warrant, subpoena or further process issued against" Ms. Pierre after she failed to respond to the show cause order. Such process had issued, and Ms. Pierre failed to identify it. Second, in responding to Question 17(b), Ms. Pierre made the affirmatively misleading statements that a summons was merely "sent" to her house, she addressed it satisfactorily, and "[n]o further action was taken on the summons[.]" Those statements constitute an affirmative, false representation that Ms. Pierre's receipt of a summons at her house ended the matter. As a result, the record contains sufficient support for the hearing judge's finding, by clear and convincing evidence, that Ms. Pierre's answer to Question 17(b) contained a knowing and intentional misrepresentation by omission. We therefore overrule Ms. Pierre's exceptions to that finding as well as the hearing judge's associated finding that, based on her answer to Question 17(b), Ms. Pierre falsely swore that her answers were complete and truthful when she signed her New York Bar Application.

### D. Misrepresentations About Ms. Pierre's Employment with Network Engineering

Ms. Pierre excepts to the hearing judge's finding that she knowingly and intentionally misrepresented that she had been employed as corporate counsel for Network

Engineering on her judicial questionnaires and in her statement under oath. Among other things, Ms. Pierre contends that Bar Counsel did not introduce any evidence that she was not employed as corporate counsel for Network Engineering. We agree. Ms. Pierre testified that she was corporate counsel for Network Engineering. No other evidence was introduced on the subject. Although the hearing judge was not convinced by Ms. Pierre's answers, that alone is insufficient to carry the Commission's burden of proving by clear and convincing evidence that Ms. Pierre made a knowing and intentional misrepresentation. *See* Md. Rule 19-727(c); *Attorney Grievance Comm'n v. White*, 480 Md. 319, 352-53 (2022). We therefore sustain Ms. Pierre's exceptions to the hearing judge's findings concerning Ms. Pierre's representations about her employment with Network Engineering.

## E.  Misrepresentations to Bar Counsel and Failure to Cooperate with Investigation

Ms. Pierre also excepts to the hearing judge's findings that she failed to cooperate during the initial stages of Bar Counsel's investigation and made misrepresentations to Bar Counsel concerning her efforts to secure counsel. Ms. Pierre contends that she did not see Bar Counsel's initial email, responded to later correspondence and remained in contact with Bar Counsel as she was waiting for information from her malpractice carrier, and ultimately answered Bar Counsel's questions in writing and in her statement under oath.

We find it impossible to separate the circumstances of Ms. Pierre's delay in responding to Bar Counsel's inquiry from the circumstances under which the inquiry began. As noted, on September 7, 2020, less than two months before election day, Bar

44

Counsel forwarded Ms. Pierre an email from the campaign manager of Ms. Pierre's four opponents that made numerous accusations against her. Bar Counsel demanded that Ms. Pierre provide a written defense of multiple statements she had made in the course of the campaign, along with other matters. Ms. Pierre failed to respond by the September 21 deadline, and then sought extensions to see if her malpractice carrier would provide her with a defense. She eventually responded, through counsel, on December 4, and then sat for her examination under oath on December 18.

Although the hearing judge resolved a factual issue against Ms. Pierre concerning the timing of when she heard back from her insurance carrier, the larger issue is that the investigation should not have occurred when it did. No exigent circumstances existed that demanded an immediate investigation. No client interests were at stake. And there is no suggestion anywhere in the record that Bar Counsel's investigation would have been prejudiced by waiting until November 4 or later to initiate it. Bar Counsel points out that Bar Counsel's office did not disclose the investigation publicly before the election, which we agree is significant. However, Ms. Pierre's perception is also significant, as is the perception of the public when the facts of the investigation became public. Here, those facts included the initiation of an investigation by Bar Counsel as an immediate response to a campaign email that expressly solicited urgent action from the legal community. In the waning weeks of the election, Ms. Pierre, the target of the investigation, was asked to divert attention from her campaign to justify, in writing and with supporting documentation, several of her campaign statements.

To be clear, we do not question Bar Counsel's motives here. Nonetheless, the risk that an impartial observer might question those motives was not worth whatever marginal value might have been perceived to lie in proceeding on the chosen timeline. Ensuring that the fairness and neutrality of investigations is not reasonably subject to question is crucial to preserving the integrity of the attorney disciplinary process. Given these very unusual circumstances, we sustain Ms. Pierre's exception to the finding that Ms. Pierre "knowingly and intentionally delayed responding to Bar Counsel's request for information without excuse."

## II. CONCLUSIONS OF LAW

We assess the hearing judge's legal conclusions without deference. *Attorney Grievance Comm'n v. O'Neill*, 477 Md. 632, 658 (2022); Md. Rule 19-740(b)(1). The hearing judge concluded by clear and convincing evidence that Ms. Pierre violated MARPC 8.1(a) and (b), 8.2(a) and (b), 8.4(a)-(d), and NYDR 1-101 and 1-102. Upon our independent analysis, we conclude that there is clear and convincing evidence that Ms. Pierre violated MARPC 8.2(a) and 8.4(a), (c), and (d) and NYDR 1-101 and 1-102.

### A. MARPC 8.1 (Bar Admission and Disciplinary Matters)

The hearing judge's conclusions that Ms. Pierre violated MARPC 8.1(a) and (b) were based on findings of fact concerning her lack of cooperation with Bar Counsel's investigation. Because we sustained Ms. Pierre's exceptions to those findings of fact, we also sustain her exceptions to the conclusions that she violated MARPC 8.1(a) and (b).

46

## B.    MARPC 8.2 (Judicial and Legal Officials)

The hearing judge concluded that Ms. Pierre violated MARPC 8.2(a) and (b) when she authorized campaign tweets about the sitting judges knowing they were false or with reckless disregard as to their truth or falsity for her personal benefit.  MARPC 8.2(a) provides:

> An attorney shall not make a statement that the attorney knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.

"In this and in other jurisdictions, the rule is well settled that an attorney who engages in making false, scandalous or other improper attacks upon a judicial officer is subject to discipline." *Attorney Grievance Comm'n v. Frost*, 437 Md. 245, 265 (2014) (quoting *In re Evans*, 801 F.2d 703, 707 (4th Cir. 1986)); *see Attorney Grievance Comm'n v. McClain*, 406 Md. 1, 15-16, 18 (2008) (finding that attorney violated Rule 8.2(a) when the attorney asserted in a brief that a judge was motivated by personal bias); *Attorney Grievance Comm'n v. DeMaio*, 379 Md. 571, 585 (2004) (finding that attorney violated Rule 8.2(a) when the attorney made "false, spurious and inflammatory representations and allegations with respect to" the Chief Judge and Clerk of the Appellate Court of Maryland).  To constitute a violation of MARPC 8.2(a), "three things must be proven by clear and convincing evidence:  (1) that the lawyer made a false statement; (2) that the statement concerned the qualifications or integrity of a judge or a candidate for judicial office; and (3) that the lawyer made the statement with knowledge that it was false or with reckless

disregard as to its truth or falsity." *Attorney Grievance Comm'n v. Stanalonis*, 445 Md. 129, 139 (2015).

We sustained the hearing judge's findings of fact that Ms. Pierre made two false statements knowing they were false or with reckless disregard as to their truth or falsity: (1) that some sitting judges "send people to jail because they could not speak English"; and (2) that "most" of the sitting judges worked at the same law firm, attend the same church, and are related. The hearing judge concluded that both of those statements also impugned the integrity of the sitting judges and so satisfied the third criteria for a violation of MARPC 8.2(a). Ms. Pierre excepts to both conclusions.

With respect to the first statement, Ms. Pierre argues that the statement did not impugn the integrity or qualifications of the sitting judges because she did not name anyone specifically. We disagree. Ms. Pierre's statement was made in the course of an election campaign in which she was running against a slate of four sitting judges on a bench of 23 active judges. The statement—made using the present tense, that "some" among that relatively small group of judges illegally send people to jail because they cannot speak English—impugned the integrity of the bench. *See Frost*, 437 Md. at 260-62 (finding a violation of MARPC 8.2(a) where attorney made statements accusing judges of corruption, including collusion to commit an illegal arrest); *see also Attorney Grievance Comm'n v. Hermina*, 379 Md. 503, 520-21 (2004) (finding MARPC 8.2 violation when attorney accused trial judge of having *ex parte* communications with opposing counsel).

We reach a different conclusion concerning the second statement, which the hearing judge found impugned the integrity of the sitting judges because "it implies that the judges

48

were appointed, not based on their qualifications and merit, but rather based upon where they worked, where they worship, and to whom they are married." The hearing judge thus found that Ms. Pierre "clearly intended to malign and misrepresent the relationships between the judges." The support for the hearing judge's conclusion is the language of the tweet, which is:

> The Sitting Judges are somewhat diverse in that they are black, Asian, gay, and straight, and men and women. But they are not really diverse. They are an in-group. Most of them have worked at the same law firm, go to the same church, and are related by marriage.

Keeping in mind that we are addressing core political speech entitled to the highest level of First Amendment protection, *Federal Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1650 (2022), and that the purpose of our inquiry is not to protect judges "from unkind or undeserved criticisms," but to "protect[] the integrity of the judicial system, and the public's confidence therein," *Frost*, 437 Md. at 263, we do not agree that Ms. Pierre's statement impugned the qualifications or the integrity of the sitting judges. The message expressed in the tweet is not that any sitting judge is unqualified or lacks integrity. Instead, the message is that they are not sufficiently diverse from each other. The facts Ms. Pierre asserts to prove that point are false, but that does not alter the character of the point. And although the hearing judge found that the tweet contains an implicit criticism of the basis on which the judges were appointed, such an implication is insufficient to provide clear and convincing evidence given the level of protection afforded to campaign speech under the First Amendment.

49

We therefore overrule Ms. Pierre's exception to the hearing judge's conclusion that she violated MARPC 8.2(a), but only with respect to her campaign's tweet stating that some sitting judges send people to jail for not speaking English.

The hearing judge also concluded that Ms. Pierre violated MARPC 8.2(b), which provides, in relevant part:

> A candidate for a judicial office:
>
> (1) shall maintain the dignity appropriate to the office and act in a manner consistent with the impartiality, independence and integrity of the judiciary;
>
> . . .
>
> (3) shall not knowingly misrepresent his or her identity or qualifications, the identity or qualifications of an opponent, or any other fact[.]

The hearing judge's conclusions that Ms. Pierre violated MARPC 8.2(b)(1) and (3) were premised on Ms. Pierre's various statements addressing the quote attributed to Judge Berry. Because we have sustained Ms. Pierre's exceptions to the findings of fact concerning those statements, we also sustain her exceptions to the conclusions of law premised on those findings. We therefore conclude that Ms. Pierre did not violate MARPC 8.2(b).

## C.    MARPC 8.4 (Misconduct)

The hearing judge concluded that Ms. Pierre violated MARPC 8.4(a), (b), (c), and (d). MARPC 8.4 provides:

> It is professional misconduct for an attorney to:
>
> (a) violate or attempt to violate the Maryland Attorneys' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as an attorney in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice[.]

### 1. MARPC 8.4(a)

"An attorney violates Rule 8.4(a) when '[the attorney] violates any other Rule under the MARPC.'" *Attorney Grievance Comm'n v. Parris*, 482 Md. 574, 597 (2023) (quoting *Attorney Grievance Comm'n v. Hoerauf*, 469 Md. 179, 214 (2020)). Ms. Pierre violated MARPC 8.4(a) because, as discussed, she violated MARPC 8.2(a).

### 2. MARPC 8.4(b)

The hearing judge concluded that Ms. Pierre violated MARPC 8.4(b) by committing perjury when she: (1) testified falsely during her statement under oath about her delay in responding to Bar Counsel's letters and her prior employment with Network Engineering; and (2) signed her New York Bar Application under oath. We sustained Ms. Pierre's exceptions concerning the findings of fact supporting the 8.4(b) violation related to her statement under oath. As a result, we conclude that Ms. Pierre did not violate 8.4(b) based on that statement.

Although we overruled Ms. Pierre's exceptions concerning her New York Bar Application, that conduct is properly subject to New York's disciplinary rules, not those of Maryland. MARPC 8.5(b) (Rule 19-308.5) provides:

> **Choice of Law**. In any exercise of the disciplinary authority of this State, the rule of professional conduct to be applied shall be as follows:

(1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and

(2) for any other conduct, the rules of the jurisdiction in which the attorney's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct. An attorney shall not be subject to discipline if the attorney's conduct conforms to the rules of a jurisdiction in which the attorney reasonably believes the predominant effect of the attorney's conduct will occur.

*See generally Attorney Grievance Comm'n v. Tatung*, 476 Md. 45, 72-81 (2021) (providing a detailed discussion of MARPC 8.5(b)). New York's disciplinary rules at least arguably apply to Ms. Pierre's New York Bar Application pursuant to subpart (1) of MARPC 8.5(b), because her application was submitted to and was pending before the New York Supreme Court, Appellate Division, Third Department. *See Tatung*, 476 Md. at 72 n.29 (observing that the MARPC defines "tribunal" as including, but not being limited to, a court). Even if not, the "predominant effect of the conduct" occurred in New York, where Ms. Pierre was seeking admission to the bar, not in Maryland.[19] *See id.* at 79-81 (discussing

---

[19] Ms. Pierre signed her New York Bar Application in Prince George's County, Maryland. However, under MARPC 8.5(b)(2), the rules of the jurisdiction in which the conduct occurred are applied unless "the predominant effect of the conduct is in a different jurisdiction." In the context of a bar application, the predominant effect of misrepresentations contained in it is felt in the state to which the application is submitted. In *Attorney Grievance Comm'n v. Malone*, 477 Md. 225 (2022), we examined the respondent's misconduct related to false and misleading statements made in connection with his application to the Texas Bar under the MARPC. However, we observed that Mr. Malone had waived any potential claim for relief based on MARPC 8.5(b) by failing to raise any objection on that ground. *Id.* at 290 n.23. Here, given that Ms. Pierre's signature under oath on the New York Bar Application is the only remaining source of a potential MARPC 8.4(b) violation, and the Commission otherwise correctly charged conduct in connection with the New York Bar Application under that State's disciplinary rules, we elect to raise the choice of law issue related to MARPC 8.4(b) ourselves. *See*

52

application of the "predominant effect" test).  As a result, MARPC 8.4(b) is not applicable to Ms. Pierre's conduct in swearing under oath, at the conclusion of her New York Bar Application, that she had "read the foregoing questions and ha[d] fully, truthfully and accurately answered the same."  We therefore sustain Ms. Pierre's exceptions to the hearing judge's conclusion that she violated MARPC 8.4(b).

### 3.  MARPC 8.4(c)

"As used in this Rule, a misrepresentation is made when the attorney knows the statement is false, and cannot be the product of mistake, misunderstanding, or inadvertency."  *Attorney Grievance Comm'n v. Taniform*, 482 Md. 272, 315 (2022) (quoting *Attorney Grievance Comm'n v. Dore*, 433 Md. 685, 698 (2013)).  An attorney violates Rule 8.4(c) by knowingly and intentionally making a false statement or by making an intentionally misleading statement or misrepresentation by omission.  *Attorney Grievance Comm'n v. Vasiliades*, 475 Md. 520, 557-58 (2021).  The hearing judge concluded that Ms. Pierre violated MARPC 8.4(c) repeatedly.  Although we have sustained Ms. Pierre's exceptions to the hearing judge's factual findings underpinning many of those violations, we overruled her exception concerning her statement that sitting judges send people to jail for not speaking English.  On the basis of that statement only, we conclude that Ms. Pierre violated MARPC 8.4(c).

*Bailey v. State*, 464 Md. 685, 698 (2019) ("In rare instances, pursuant to Maryland Rule 8-131(a), we may exercise our discretion to review an unpreserved issue."); *see also Ray v. State*, 435 Md. 1, 22 (2013) (stating that Rule 8-131(a) "clearly authorizes an appellate court to address an unpreserved issue").

### 4. MARPC 8.4(d)

"Generally, a lawyer violates M[A]RPC 8.4(d) where the lawyer's conduct would negatively impact the perception of the legal profession of a reasonable member of the public." *Attorney Grievance Comm'n v. Collins*, 477 Md. 482, 510 (2022) (quoting *Attorney Grievance Comm'n v. Slate*, 457 Md. 610, 645 (2018)). Clear and convincing evidence supports the hearing judge's conclusion that Ms. Pierre violated MARPC 8.4(d). We agree with the hearing judge that knowledge that a lawyer had falsely, and very publicly, accused judges of unlawfully sending people to jail for not speaking English would negatively affect a reasonable member of the public's perception of the legal profession. *See Frost*, 437 Md. at 265 ("[A] public, false and malicious attack on a judicial officer . . . may bring discredit upon the administration of justice amongst citizens who have no way of determining the truth of the charges." (quoting *In re Evans*, 801 F.2d at 707)). We overrule Ms. Pierre's exception to that conclusion of law.

### D. NYDR 1-101 (Maintaining Integrity and Competence of the Legal Profession)

NYDR 1-101(a), as of the date Ms. Pierre submitted her 1999 New York Bar Application, provided:

> A lawyer is subject to discipline if the lawyer has made a materially false statement in, or has deliberately failed to disclose a material fact requested in connection with, the lawyer's application for admission to the bar.

Consistent with this Court's application of the analogous MARPC provisions, the Supreme Court Appellate Divisions of New York have emphasized that "[c]andor and the voluntary revelation of negative information by an applicant are the cornerstones upon which is built

54

the character and fitness investigation of an applicant for admission to the New York State Bar." *Matter of Avolio*, 186 N.Y.S.3d 858, 859 (App. Div. 2023) (per curiam). "[A] material misrepresentation or omission in an applicant's admission application deprives the Court's Committee on Character and Fitness . . . of all the information it might find relevant in assessing the applicant's candidacy, and lack of candor ultimately effects an admission upon false pretenses[.]" *Matter of DeMaria*, 62 N.Y.S.3d 226, 228 (App. Div. 2017) (per curiam). "Whatever the importance of any one question or answer or item of information, the overriding consideration is disclosure and truthfulness." *Matter of Steinberg*, 528 N.Y.S.2d 375, 379 (App. Div. 1988) (per curiam).

The hearing judge concluded that Ms. Pierre violated NYDR 1-101 when she provided knowingly false and misleading information in response to Question 17(b). We overruled Ms. Pierre's exception to the hearing judge's findings concerning the response to Question 17(b). Based on those findings, we agree that clear and convincing evidence supports the conclusion that Ms. Pierre violated NYDR 1-101 by providing incomplete and intentionally misleading information about the July 1, 1996 incident in which she was detained on a body attachment, brought to court by the sheriff, and required to post a bond to obtain her release. *See Matter of Avolio*, 186 N.Y.S.3d at 860 (finding that attorney who failed to disclose an arrest that occurred after attorney submitted application but before admitted demonstrated a lack of candor and cautioning that "even a careless mistake in failing to make required disclosures in the admission process—as opposed to a failure based on a deceptive or fraudulent motive—warrants the need for a public disciplinary sanction"); *Matter of DeMaria*, 62 N.Y.S.3d at 227-29 (finding attorney made material

55

misrepresentation on application when he indicated that he was seeking admission in a foreign jurisdiction but failed to disclose his admission had been denied); *Matter of Olivarius*, 941 N.Y.S.2d 763, 765 (App. Div. 2012) (per curiam) ("[The attorney] clearly fell woefully short of submitting an application for admission that properly and with candor supplied all requested information. The application submitted by respondent had the effect of deflecting appropriate inquiry by this Court's Committee on Character and Fitness rather than apprising it of relevant potential character and fitness concerns."); *Matter of Wood*, 767 N.Y.S.2d 286, 286 (App. Div. 2003) (per curiam) ("We reiterate that candor and the voluntary revelation of negative information by an applicant for admission are the cornerstones upon which is built the character and fitness investigation." (citation omitted)).

### E. NYDR 1-102 (Misconduct)

NYDR 1-102, as of the date Ms. Pierre submitted her New York Bar Application, provided:

> a. A lawyer or law firm shall not:
>
> 1. Violate a Disciplinary Rule.
>
> . . .
>
> 4. Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
>
> 5. Engage in conduct that is prejudicial to the administration of justice.
>
> . . .
>
> 8. Engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.

56

The hearing judge concluded that the same "facts that support violations of NYDR 1-101(a) also support violations of NYDR 1-102(a)(1), (4), (5) and (8)."  According to the hearing judge, Ms. Pierre also "violated NYDR 1-102(a)(1), (4), (5) and (8) [because] she falsely swore that her answers were complete and truthful when she signed the Bar Application" under oath and stated that she had "fully, truthfully and accurately answered the same."[20]  We agree that Ms. Pierre's knowingly false and misleading response to Question 17(b) constitutes clear and convincing evidence of a violation of NYDR 1-102(a)(1), (4), (5), and (8), for reasons previously discussed.

In sum, we conclude that Ms. Pierre violated MARPC 8.2(a), MARPC 8.4(a), (c), and (d), and NYDR 1-101 and 1-102(a)(1), (4), (5), and (8).

## III.  SANCTION

"As we have often stated, the purpose of attorney discipline proceedings is not to punish the attorney but to protect the public and deter other lawyers from engaging in misconduct." *Attorney Grievance Comm'n v. Culberson*, 483 Md. 294, 324 (2023).  "[W]e seek to impose sanctions that are 'commensurate with the nature and gravity of the violations and the intent with which they were committed,' while considering the unique circumstances of each case and any aggravating or mitigating factors." *Attorney Grievance Comm'n v. Kaufman*, 466 Md. 404, 428 (2019) (quoting *Attorney Grievance Comm'n v. Williams*, 446 Md. 355, 376 (2016)).

---

[20] The Commission did not charge Ms. Pierre with a violation of NYDR 1-102(a)(3), the analogue to MARPC 8.4(b), which prohibits an attorney from "[e]ngag[ing] in illegal conduct that adversely reflects on the lawyer's honesty, trustworthiness or fitness as a lawyer."

### A. Aggravating and Mitigating Factors

Aggravating factors "militate in favor of a more severe sanction." *Attorney Grievance Comm'n v. Bonner*, 477 Md. 576, 608 (2022) (quoting *Attorney Grievance Comm'n v. Miller*, 467 Md. 176, 233 (2020)); *see also Attorney Grievance Comm'n v. Malone*, 482 Md. 82, 120 (2022) (providing a list of recognized aggravating factors). The hearing judge found by clear and convincing evidence the existence of seven aggravating factors, including that Ms. Pierre: (1) "had a dishonest or selfish motive"; (2) obstructed the attorney discipline proceeding; (3) "engaged in illegal conduct when she testified falsely under oath and when she signed her New York Bar Application under oath"; (4) engaged in a pattern of misconduct; (5) committed multiple violations of the MARPC; (6) "made misrepresentations to Bar Counsel"; and (7) has substantial experience in the practice of law, having been admitted to practice law in 1992.

Ms. Pierre excepted to each factor other than experience in the practice of law, stating that Bar Counsel failed to produce clear and convincing evidence to sustain those factors. Of her experience in the practice of law, Ms. Pierre noted that this case is not about her law practice and therefore that aggravating factor should carry little weight. We conclude that clear and convincing evidence supports three aggravating factors: (1) a dishonest or selfish motive; (2) substantial experience in the practice of law; and (3) illegal conduct.

First, clear and convincing evidence supports the conclusion that Ms. Pierre demonstrated a selfish motive when she falsely stated that sitting judges send people to jail for not speaking English to bolster her campaign against the sitting judges and in her false

and misleading response to Question 17(b) on her New York Bar Application in her attempt to gain admission to the New York Bar. Second, Ms. Pierre has substantial experience in the practice of law, although that was not true at the time of her New York Bar Application. Although Ms. Pierre is correct that her violations do not relate to her legal practice, her level of experience is nonetheless relevant to expectations of her conduct. Third, Ms. Pierre engaged in illegal conduct when she signed her New York Bar Application under oath and attested that she had "fully, truthfully and accurately" answered the questions in the application.

Clear and convincing evidence does not support the other aggravating factors found by the hearing judge. First, because we sustained Ms. Pierre's exceptions to the findings related to her initial delay in responding to Bar Counsel, we do not find the aggravating factor of bad faith obstruction of the disciplinary process. Second, because we have sustained violations based on only one statement made in 2020 and one response on her New York Bar Application, and those two incidents are entirely unrelated, Ms. Pierre did not engage in "a pattern of misconduct." Third, although Ms. Pierre violated multiple provisions of the MARPC, they were all based on a single statement. Fourth, because we sustained Ms. Pierre's exceptions to the findings related to her statement under oath to Bar Counsel, clear and convincing evidence does not support the aggravating factor of submission of false evidence or statements during the attorney disciplinary process.

"[T]he existence of mitigating factors tends to lessen or reduce the sanction an attorney may face." *Attorney Grievance Comm'n v. Johnson*, 472 Md. 491, 548 (2021) (quoting *Attorney Grievance Comm'n v. Smith-Scott*, 469 Md. 281, 365 (2020)); *see also*

59

*Attorney Grievance Comm'n v. Kalarestaghi*, 483 Md. 180, 242 (2023) (providing a list of recognized mitigating factors). The hearing judge found by a preponderance of the evidence the existence of four mitigating factors: (1) no prior record of attorney discipline; (2) Ms. Pierre "generally enjoys a good reputation as a zealous advocate for her clients in CINA and juvenile matters" and "is of generally good character, despite certain lapses in judgment in her pursuit of a judgeship"; (3) "it is more likely than not that [Ms. Pierre's] expressed remorse is sincere"; and (4) repetition of the misconduct is unlikely. Bar Counsel did not except to any of these findings and the record supports the hearing judge's findings.

Ms. Pierre excepted to the hearing judge not finding: (1) the absence of a dishonest or selfish motive; (2) good faith efforts to rectify any misconduct; (3) full and free disclosure to the disciplinary board; (4) a cooperative attitude towards the proceedings; and (5) delay in the disciplinary proceedings for violations related to her student loan case from nearly 30 years ago. Having thoroughly reviewed the record, we find no error in the hearing judge's determinations with respect to any of those mitigating factors.

## B.     The Sanction

The Commission recommends that Ms. Pierre be disbarred. In making that recommendation, the Commission "focuses on [Ms. Pierre's] misconduct associated with her 1999 New York bar application and the eight [Judicial] Questionnaires she filed . . . between March 2012 and August 2017." Ms. Pierre recommends that the Court impose no sanction.

In determining an appropriate sanction, we are mindful of the context in which this case has arisen, as discussed above at length. Because of the unusual context, we do not find our dispositions rendered in other matters to be useful in identifying an appropriate sanction here. Considering all relevant factors, we conclude that a reprimand is the appropriate sanction. Although Ms. Pierre's violations, especially in connection with her New York Bar Application, would call for a more severe sanction under different circumstances, we cannot ignore the circumstances present here. We acknowledge that our rules do not contain any guidelines for how to handle allegations of misconduct by lawyers involved in elections generally or in judicial elections specifically.[21] In the absence of such guidelines, we do not assign fault for the path taken here. However, in determining an appropriate sanction, we cannot ignore that path and its potential implications for the public perception of the integrity of the attorney disciplinary process.

We also cannot ignore that Ms. Pierre engaged in serious misconduct. She falsely accused sitting judges of sending people to jail for not speaking English, and she provided a false and misleading response to a question on her New York Bar Application that omitted important information expressly covered by the question. She also engaged in other conduct that, even if it has not resulted in sustained violations of the MARPC, is troublesome. To be clear, similar conduct in different circumstances may result in much

---

[21] As identified in footnote 5, to provide guidance in the future, we will refer to our Standing Committee on the Rules of Practice and Procedure consideration of adopting a rule establishing procedures for addressing alleged misconduct violations that arise during the pendency of election campaigns generally and campaigns for judicial offices specifically.

61

different outcomes than we reach today with respect to both violations and sanction. Nothing in this opinion should be viewed as approving of the conduct underlying the charges brought.

The unusual circumstances presented in this matter dictate its outcome. *Cf. Attorney Grievance Comm'n v. Jackson*, 477 Md. 174, 218-19, 225 (2022) (imposing no sanction because of "unique facts" of case); *Attorney Grievance Comm'n v. Pinkney*, 311 Md. 137, 141-43 (1987) (imposing only a 90-day sanction despite finding numerous disciplinary violations because of the "highly unusual circumstances" of the case). Accordingly, we impose a reprimand.

**IT IS SO ORDERED; PETITIONER AND RESPONDENT SHALL EVENLY SPLIT ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d).**

Circuit Court for Anne Arundel County
Case No. C-02-CV-21-001655

Argued: February 2, 2023

IN THE SUPREME COURT

OF MARYLAND*

AG No. 42

September Term, 2021

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

MARYLIN PIERRE

Fader, C.J.
Watts
Hotten
Booth
Biran
Eaves
Battaglia, Lynne A.
    (Senior Justice, Specially Assigned),

JJ.

Concurring Opinion by Battaglia, J.

Filed: August 16, 2023

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

I write separately to concur. I agree with the majority in its thorough analysis of the rule violations and the determination of sanction of Ms. Pierre.

I briefly write separately to underscore that the "context" of the case created by Bar Counsel, addressed so eloquently by the majority as well as the dissent, is deeply regretful to me as reflecting poor judgment by an individual in whom the Court invested the authority to investigate and enforce the rules governing our profession. As a former United States Attorney, I believe that those who enforce our norms must do so by exercising judgment that is unassailable.

In the present situation, the initiation of an investigation by Bar Counsel of an attorney running for office during an election, on a "moment's notice" on the basis of an email and a conversation with an avowed antagonist to Ms. Pierre in the campaign process, does not reflect "good judgment." My disquietude with the acts of Bar Counsel certainly encompasses all that which has been identified by the majority and discussed with more specificity by the dissent, but I need only emphasize that the decision to pursue an investigation, especially during the course of an election, should have been undertaken with greater deliberateness and prudence.

The rapidity by which Bar Counsel reacted was not only not justified under the circumstances, as the majority notes, but undermined the legitimacy of Bar Counsel's endeavor. I write separately to underscore that there were other choices in terms of timing and demeanor that should have been exercised by Bar Counsel.

IN THE SUPREME COURT

OF MARYLAND*

AG No. 42

September Term, 2021
_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

MARYLIN PIERRE
_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Eaves
Battaglia, Lynne A. (Senior
Justice, Specially Assigned),

JJ.
_____

Concurring and Dissenting Opinion by Watts, J.
_____

Filed:  August 16, 2023

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland.  The name change took effect on December 14, 2022.

Respectfully, I concur and dissent. I substantially agree with the majority opinion and its thorough analysis and resolution of the violations of the Maryland Attorneys' Rules of Professional Conduct ("MARPC") at stake in this case. In particular, I agree that Marylin Pierre, Respondent, violated MARPC 8.2(a) by making statements with reckless disregard for their truth or falsity about Judges of the Circuit Court for Montgomery County sending people to jail because they do not speak English. See Maj. Op. at 33-34, 48. I write separately to provide my views because of the extraordinary circumstances involved in the investigation and handling of this matter. In light of those circumstances, I would have gone a step further than the majority opinion, which determines a reprimand to be the appropriate sanction, see Maj. Op. at 60-62—I would have dismissed the case and imposed no sanction.

Due to the extraordinary circumstances of the case discussed at length in the majority opinion, as in Attorney Grievance Comm'n v. Jackson, 477 Md. 174, 269 A.3d 252 (2022), and Attorney Grievance Comm'n v. Singh, 483 Md. 417, 292 A.3d 818 (2023) (per curiam), I would conclude that no sanction is appropriate in this case. It is not possible to separate the circumstances of the investigation, which should not have been initiated and conducted in the manner that it was, from the imposition of a sanction. Like the respondents in Jackson and Singh, Ms. Pierre was the subject of a lengthy investigation by Bar Counsel that resulted in most of the charges in the petition for disciplinary or remedial action ("PDRA") not being sustained. As in both Jackson and Singh, the violations determined did not involve harm to any client. See Jackson, 477 Md. at 181-82, 223-24, 269 A.3d at 256-57, 281-82; Singh, 483 Md. at 421-22, 292 A.3d at 821. And, like the

respondent in <u>Singh</u>, Ms. Pierre was subject to an intense, wide-ranging investigation. <u>See</u> <u>Singh</u>, 483 Md. at 420, 292 A.3d at 820.

More importantly, this case has additional extraordinary circumstances that were not present in <u>Jackson</u> or <u>Singh</u>. This case arose in the context of alleged violations of the MARPC concerning speech related to a judicial election and presented First Amendment concerns, and the manner in which the investigation was initiated and conducted gave rise to the risk that it could have been seen as an attempt to interfere in a judicial election in favor of sitting judges. None of the cases in which we have previously found that a sanction was not appropriate and dismissed have involved investigations that had the potential to so severely undermine the integrity of the attorney disciplinary process. None of the cases in which we have previously found that a sanction was not appropriate and dismissed resulted in recommendations from this Court for new Maryland Rules because of Bar Counsel's investigation. In this case, Bar Counsel pursued a 14-month-long investigation of Ms. Pierre[1] (which Bar Counsel had the discretion not to initiate), after not having filed a complaint and under circumstances that risked giving rise to the perception that the investigation was undertaken to influence a contested judicial election and caused this Court to recommend the development of a new Rule pertaining to Bar Counsel's investigation of candidates during elections. These are extraordinary circumstances not

---

[1]The investigation began on August 28, 2020, less than an hour after Bar Counsel received an email from the campaign chairperson for sitting judges in a judicial election and ended at the time the PDRA was filed on November 18, 2021.

present in any other case that this Court has had before it and negate the propriety of imposing a sanction.

In this case, because of the investigation, the Majority makes a thoughtful recommendation (which I agree with) concerning the need for a Rule governing Bar Counsel's investigation of candidates for judicial office and in elections in general. See Maj. Op. at 4-10 & n.5. The majority opinion's suggestion is warranted and will undoubtedly enhance fairness in the disciplinary process. The majority opinion points out that no Maryland Rule concerns an investigation by Bar Counsel of a candidate in a judicial election, or requires Bar Counsel to delay such an investigation until after a judicial election. See Maj. Op. at 1. To be sure, Maryland Rule 19-711 does not contain such a provision. There is no election-related counterpart to Maryland Rule 19-711(b)(5), which allows Bar Counsel, with the approval of the Attorney Grievance Commission, to defer action on a complaint where "a civil or criminal action involving material allegations against the attorney substantially similar or related to those alleged in the complaint is pending in any court of record in the United States, or" where "substantially similar or related allegations presently are under investigation by a law enforcement, regulatory, or disciplinary agency[.]"

In this case, though, it is of no moment that no Maryland Rule required Bar Counsel to defer action on a complaint until after a judicial election, given that there was no complaint filed against Ms. Pierre by anyone in the first place—rather, Bar Counsel initiated an investigation of Ms. Pierre on her own (in response to campaign literature), without a complaint from anyone. In other words, Bar Counsel did not receive a complaint,

- 3 -

which would have ordinarily required an inquiry. Bar Counsel acted completely independently in initiating an investigation based on a campaign email. Maryland Rule 19-711(b) dictates how Bar Counsel must respond to a complaint. Maryland Rule 19-711(b)(1) states that "Bar Counsel shall make an inquiry concerning every complaint that is not facially frivolous, unfounded, or duplicative." Under Maryland Rule 19-711, in the absence of a complaint, Bar Counsel was not required to open an investigation of Ms. Pierre approximately 2 months before the election and Bar Counsel had the discretion not to do so.

The unique facts of this case make it readily apparent that the circumstances under which Bar Counsel initiated and pursued the investigation gave rise to—irrespective of Bar Counsel's motivations—at a minimum, the risk that members of the public could perceive that the investigation was undertaken to influence the election in favor of the sitting judges, *i.e.*, the appearance of a conflict of interest for the Office of Bar Counsel and Bar Counsel. A reasonable member of the public could easily have perceived that, without having received a complaint or even a request for an investigation, Bar Counsel opened an investigation on her own initiative approximately 2 months before an upcoming judicial election and risked potentially intervening in the election in a manner that benefitted the sitting judges. In this case—regardless of any motivations on Bar Counsel's part—it easily could have been perceived that the Office of Bar Counsel's resources were deployed in a manner that could have been seen as intervening in a judicial election in a way that helped the sitting judges. This is an extraordinary circumstance that undermines public confidence in any sanction imposed in the case and on its own warrants the dismissal of the case.

Another extraordinary circumstance in the case is that the record reflects that Ms. Pierre received no notice of Bar Counsel's investigation of her New York Bar application prior to the filing of the PDRA and was deprived of an opportunity to provide a response to this aspect of investigation for consideration by the Attorney Grievance Commission prior to its authorization of the PDRA. Maryland Rule 19-711(c)(1) states that "Bar Counsel shall notify the attorney who is the subject of the complaint that Bar Counsel is undertaking an investigation to determine whether the attorney has engaged in professional misconduct" and that "[t]he notice . . . shall include . . . the general nature of the professional misconduct . . . under investigation."[2] Bar Counsel notified Ms. Pierre of the investigation in a letter dated September 7, 2020. The letter identified 12 items related to alleged misconduct but did not contain any information concerning Ms. Pierre having made a false statement by act or omission on her New York Bar application. Although Bar Counsel mentioned Ms. Pierre's judicial questionnaires and questioned her disclosure of the circuit court's issuance of a writ of body attachment in the questionnaires, the September 7, 2020 letter gave Ms. Pierre no notice that her 1999 New York Bar application was the subject of investigation.

Apart from Bar Counsel's September 7, 2020 letter, the record does not contain any other notice of alleged misconduct under investigation that Bar Counsel sent to Ms. Pierre

---

[2]The only exceptions to this requirement are that "Bar Counsel need not give notice of investigation to an attorney if, with the approval of the Commission, Bar Counsel proceeds under" Maryland Rule 19-737 (Reciprocal Discipline or Inactive Status), Maryland Rule 19-738 (Discipline on Conviction of Crime), or Maryland Rule 19-739 (Transfer to Disability Inactive Status). Md. R. 19-711(c)(2). These exceptions do not apply here.

or her counsel before filing the PDRA. As a result, in his December 4, 2020 response to Bar Counsel's September 7, 2020 letter, Ms. Pierre's counsel was unable to address the omission of information about the body attachment from her New York Bar application. Additionally, when Ms. Pierre provided a statement under oath for Bar Counsel on December 18, 2020, Ms. Pierre had no notice that Bar Counsel was investigating whether she made false statements on her New York Bar application. The lack of notice to Ms. Pierre on the topic of her New York Bar application is an extraordinary deviation from the process afforded attorneys in disciplinary cases under the Maryland Rules and undercuts the validity of the imposition of a sanction for the violation—even the issuance of a reprimand.

After a thoughtful and well-written explanation of the unusual circumstances of the investigation and appropriately instructing that "[t]he Commission's and Bar Counsel's close connection to the Judiciary advise caution in taking actions against a candidate who is challenging sitting judges to avoid the possibility that members of the public may perceive such actions as motivated by a desire to support the sitting judges[,]" the Majority elects to impose the sanction of a reprimand. Maj. Op. at 10. This case involves an overlay of extraordinary circumstances, see Maj. Op. at 1, however, and too many questions remain unanswered as to Bar Counsel's investigation and use of the Maryland Rules to permit the imposition of a sanction. These questions include, but are not limited to:

1. What occurred during the less than one hour between Bar Counsel receiving the campaign email and opening the investigation?

2. Why did Bar Counsel not file a complaint against Ms. Pierre pursuant to Maryland Rule 19-711(a)?

3. Why did Bar Counsel fail to notify Ms. Pierre pursuant to Maryland Rule 19-711(c)(1) that she was under investigation for having made false statements on her New York Bar application?

4. Why did Bar Counsel cite Maryland Rule 19-711(d) and advise Ms. Pierre in the September 7, 2020 letter notifying her of the investigation that she had until September 21, 2020, to respond, that she had only 10 days to request an extension, and that ordinarily no extension would be granted for more than 10 days without good cause?

5. Did the investigation comply with Maryland Rule 19-707's requirement of confidentiality? Was it reasonably necessary for Bar Counsel to disclose the existence of the investigation to the campaign chairperson or to the sitting judges and did the existence of the investigation become more widely known before the PDRA was filed?

6. Why did Bar Counsel respond to a discovery request from Ms. Pierre by stating that Bar Counsel had "initiated a complaint" when no complaint had been filed? Was Bar Counsel's response to the request for admissions accurate and fair to opposing counsel?

7. What were the circumstances of Bar Counsel's involvement in the discovery dispute that necessitated this Court granting Ms. Pierre's emergency motion to stay and subsequently approving amendments to Maryland Rule 19-726, which rendered the dispute moot?

8. Is MARPC 1.7(a)(2), which provides in relevant part that an attorney shall not represent a client if there is a significant risk that the representation of a client will be materially limited by a personal interest of the attorney, implicated based on the extraordinary circumstances of the investigation?[3]

---

[3]At various points in its opinion, the Majority states "we do not question Bar Counsel's motives[,]" "we do not mean to suggest that the actions of Bar Counsel in this case were improperly motivated[,]" and that it does not question "the good faith" of Bar Counsel. Maj. Op. at 46, 10 n.13, 2. Undoubtedly, these comments were made in an effort to ensure public confidence in the integrity of the attorney discipline process and in the imposition of a sanction in this case. My fear is that such statements, though well intended, under the circumstances of this case, may have the exact opposite effect.

In her exceptions, Ms. Pierre raised numerous questions about Bar Counsel's motives and good faith. For instance, Ms. Pierre asserted that "Bar Counsel's approach would protect the power of incumbents while increasing her own authority to punish their

On the other side of the ledger, although Ms. Pierre violated the MARPC, the misconduct that she engaged in is unlikely to be repeated and involved no harm to any client. The conduct in one instance occurred during Ms. Pierre's candidacy in a judicial election and, by its nature, is conduct that is unlikely to recur and, in the second instance, the conduct occurred decades ago and is also unlikely to be repeated. Although Ms. Pierre's campaign tweet about sending people to jail for not speaking English was false, was not written as a statement of opinion, and was made, at a minimum, with reckless disregard for its truth or falsity, this case involved no complaint from any client and Ms. Pierre has no prior disciplinary history. In addition, Ms. Pierre candidly admitted at the disciplinary hearing that the campaign statement was false.

As to Ms. Pierre having made a false statement by omission on her New York Bar application by not disclosing the existence of the show cause order and body attachment, this conduct occurred approximately 24 years ago, in 1999. The hearing judge found that Ms. Pierre "generally enjoys a good reputation as a zealous advocate for her clients in CINA and juvenile matters[,]" and "is of generally good character[.]" It is not possible to

---

rivals" and that this Court's ruling had the potential to "give one of its most powerful officials free reign to take sides in contested elections and punish the opposition." In determining whether Ms. Pierre violated the charged MARPC, it is not necessary for this Court to reach any conclusions as to Bar Counsel's motives. And, motivation and good faith, or the lack thereof, like intent, are often difficult for a hearing judge or trial court to assess, even after extensive fact-finding proceedings, which have not occurred here. In this case, the better course of action to ensure public confidence in the investigation and sanction imposed would be for the Court to refer the matter to the Attorney Grievance Commission for the appointment of special counsel pursuant to Maryland Rule 19-702(h)(6) to investigate the circumstances of the investigation and issue a report as to its compliance with the Maryland Rules or for the Court under its inherent supervisory authority to appoint special counsel to do the same.

know whether the Attorney Grievance Commission would have even authorized charging this conduct in the PDRA had Ms. Pierre been given notice of this part of the investigation and an opportunity to respond. In light of the circumstances of this case—that the case does not involve any client harm, that Ms. Pierre generally enjoys a good reputation with respect to her work, and that the conduct at issue is unlikely to be repeated—it cannot be said that sanctioning Ms. Pierre is necessary to protect the public. It must not be forgotten that the purpose of the imposition of a sanction in an attorney discipline case is to protect the public, not punish the attorney. See, e.g., Attorney Grievance Comm'n v. Wescott, 483 Md. 111, 127, 290 A.3d 1014, 1023 (2023).

Given the extraordinary circumstances of the case, which exceed those of Jackson and Singh, and which gave rise to the risk that members of the public could potentially conclude that an investigation was undertaken in an attempt to interfere with a judicial election and that this necessitated a recommendation for rulemaking (which I join), I would exercise the Court's discretion to conclude that no sanction is appropriate. These circumstances, along with numerous unresolved questions about the investigation, serve to undermine confidence in the integrity of any sanction imposed in the case, and sanctioning Ms. Pierre is not necessary to protect the public.

For the above reasons, respectfully, I concur and dissent.

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/42a21agcn.pdf

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/coa/42a21agcn2.pdf